**FEDERAL ELECTION COMMISSION, Plaintiff,**

v.

**The CHRISTIAN COALITION, Defendant.**

**No. CIV. A. 96–1781(JHG).**

United States District Court, District of Columbia.

Aug. 2, 1999.

---

Robert William Bonham, III, Lawrence Mark Noble, Richard Blair Bader, Stephen E. Hershkowitz, Erin K. Monaghan, Holly J. Baker, Federal Election Com'n, Washington, DC, for Federal Election Com'n.

48

James Bopp, Jr., Heidi K. Meyer, Paul Scholle, Bopp, Coleson & Bostrom, Terre Haute, IN, Frank Myers Northam, Alan Page Dye, Webster, Chamberlain, & Bean, Washington, DC, for Christian Coalition.

Bobby Roy Burchfield, Thomas Overton Barnett, Covington & Burling, Washington, DC, for George Bush, Dan Quayle, Bush-Quayle '92 Primary Committee, Robert M. Teeter, Mary J. Matalin, Charles R. Black, Jr.

Anthony Joseph Coppolino, U.S. Dept. of Justice, Washington, DC, for Archivist of U.S, National Archives & Records Admin.

Michael B. Trister, Lichtman, Trister, Singer & Ross, Washington, DC, for AFL–CIO, American Civil Liberties Union, amicus.

Joseph William Koegel, Jr., Steptoe & Johnson, L.L.P., Washington, DC, for Christian Broadcasting Network, Inc., movant.

### OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

This enforcement action was brought by the Federal Election Commission ("FEC" or "Commission") alleging that the Christian Coalition ("the Coalition") violated federal campaign finance laws during congressional elections in 1990, 1992 and 1994, and the presidential election in 1992. The Coalition is a corporation, and this case presents two novel issues concerning restrictions on corporate campaign-related activity.

Federal campaign finance law prohibits corporations and labor unions from using general treasury funds to make *contributions*—in cash or in kind—to a candidate for federal office.[1] But corporations and unions can make *independent expenditures* that are related to a federal election campaign so long as those expenditures are not for communications that expressly

advocate the election or defeat of a clearly identified candidate for federal office.

The first issue is one of first impression in this Circuit and has created a moderate division of opinion among other Circuits. The question presented is whether "express advocacy" by corporations and labor organizations is limited to communications that use specified phrases, such as "vote for Smith" or "support Robinson," or whether a more substantive inquiry into the clearly intended effect of a communication is permissible. The FEC advocates a substantive inquiry and alleges that the Coalition used general corporate funds to expressly advocate the election or defeat of certain candidates through a speech made by the Coalition's then-Executive Director, Ralph Reed, and by certain of the Coalition's direct-mail communications.

The second novel issue relates to how an in-kind campaign contribution is to be defined. According to the FEC, the Coalition spent considerable general corporate funds in coordination with the election campaigns of certain Republican candidates and the National Republican Senatorial Committee—the FEC refers to this spending as "coordinated expenditures"—to produce and distribute millions of "voter guides," and "Congressional Scorecards" comparing candidates' or incumbents' positions on certain issues. Although these materials made clear which candidates the Coalition preferred, the FEC acknowledges that most of the voter guides did not expressly advocate the election or defeat of any particular candidate. The FEC's theory is not that the election materials themselves violated the "express advocacy" limitation on independent corporate expenditures but that the Coalition's extensive consultations with the campaign staff of certain candidates regarding the distribution of its voter guides and other materials turned otherwise permissible

---

1. Corporations and unions can create segregated funds—a type of political action committee (PAC)—for the purpose of contributing to federal election campaigns. PACs are subject to a number of reporting requirements and a limit on the total amount that can be contributed to individual candidates and in an election cycle.

campaign-related materials into illegal in-kind campaign contributions.

The FEC and the Coalition each have filed a motion for summary judgment. Giving new meaning to the saying "politics makes strange bedfellows," the Coalition's position regarding "coordinated expenditures" is supported by *amici,* the American Federation of Labor and Congress of Industrial Organizations ("AFL–CIO") and the American Civil Liberties Union ("ACLU"). Having considered all the briefs, oral argument, and the entire record in this matter, the Court will grant both motions in part and deny both motions in part. The FEC is entitled to a civil penalty for the Coalition's express advocacy of House Speaker Newt Gingrich's reelection in 1994 and for the Coalition having provided the senatorial campaign of Oliver North with a valuable mailing list. The FEC is not entitled to injunctive relief. Three issues are left to be determined: (1) the fair market value of the mailing list; (2) whether the Coalition coordinated its selection of issues on its 1994 Virginia senatorial voter guide with Oliver North's campaign; and (3) the amount of civil penalty to which the FEC is entitled. While the Court rejects some of the Coalition's legal contentions, in all other respects, judgment is in favor of the Coalition.

## I. Procedural History

### A. The Parties

The FEC is the independent agency of the United States government with exclusive primary jurisdiction over the administration, interpretation and civil enforcement of the Federal Election Campaign Act ("FECA"), 2 U.S.C. §§ 431–455. The FEC is authorized to institute investigations of possible violations of the Act and has exclusive jurisdiction to initiate civil actions in the United States district courts to obtain judicial enforcement of the Act. *Id.* §§ 437c(b)(1), 437d(e).

The Christian Coalition was and is a corporation incorporated under the laws of the Commonwealth of Virginia which transacts business in the District of Columbia. The Coalition had its roots in the unsuccessful 1988 presidential campaign of Marion G. "Pat" Robertson ("Robertson"). Robertson was and is well known as the host of the "700 Club" television program, which during the relevant periods herein aired on Robertson's Christian Broadcasting Network ("CBN"). In the aftermath of the election Robertson sought to create an organization that would provide a voice in the public arena for Christians and other "people of faith." Robertson discussed his interest in creating such an organization with Ralph E. Reed, Jr. ("Reed") at a dinner given by Students for America during President Bush's 1989 inauguration.[2] Reed submitted a proposal to Robertson and a meeting was held in the fall of 1989 with Reed, Robertson, and various other participants, many of whom were supporters of Robertson's 1988 presidential campaign. The Coalition was formed soon thereafter.

The Coalition's Articles of Incorporation were signed on October 2, 1989. Robertson is the corporation's Chairman of the Board and former President. The Coalition is a nonprofit, non-stock corporation financed by voluntary contributions obtained through fund raising and telemarketing activities. The Coalition has five stated purposes: (1) to represent Christians before local councils, state legislatures and the United States Congress; (2) to train Christians for effective political action; (3) to inform Christians of timely issues and legislation; (4) to speak out in the public arena and the media; (5) to protest anti-Christian bigotry and defend

---

**2.** Students for America is a self-described conservative student group with a particular emphasis on Judeo–Christian values. It was formed by Reed in 1984 as a political action committee for the purpose of conducting campus-based efforts to support the reelection campaign of Senator Jesse Helms of North Carolina.

the legal rights of Christians. *See* CC Ex. 11 at 2–302—306, 314.[3]

Reed served as the Executive Director of the Coalition from October 2, 1989 until June 11, 1997. Reed also joined the Board of Directors in 1994. As Executive Director, Reed supervised the day-to-day operations of the Coalition and formulated policy for legislative projects. Reed was responsible for fund raising activities and publications, press communications, and various other supervisory tasks. The voter guides, congressional scorecards and training sessions were all the brainchild of Reed.

The Coalition began as a centralized, national organization, but five regional directors, working under the supervision of a national field director, were soon hired and assigned to establish separate state affiliates. There are currently Coalition affiliates in every state except Utah. Each state affiliate is a separate corporation and each has a written affiliation agreement with the Coalition. The affiliation agreements contain guidelines requiring the state affiliates to answer to the Coalition on certain matters. The affiliates generally conduct their own affairs, however, on matters not covered by the written agreement. Funding is provided to the state affiliates from the Coalition's state project fund, which receives 15 percent of the Coalition's direct mail revenue.

Some of the alleged FECA violations at issue in this case involve actions by the Coalition's state affiliates. The Coalition asserted that it could not be held responsible for the affiliates' actions because they were separate corporate entities. However, because the Coalition was unable to meet its discovery obligations with respect to information about Coalition-affiliate relations, the Coalition stipulated, for purposes of this action, that it

controls and is legally responsible for its state/and or local affiliates' activities regarding, referring or relating to (i) all voter identification activities, get-out-the-vote activities, and voter guide preparation and distribution activities for federal elections held in 1990, 1992 and 1994, and (ii) all other correspondence and communications that use the term "Christian Coalition" with the general public and/or with candidates for federal office and for federal elections held in 1990, 1992 and 1994, (iii) except for specific actions by officials or agents of state affiliates that the Christian Coalition shows to have been *ultra vires*.

Stipulation for Partial Dismissal ¶ 5.

The Coalition conducts many activities to further its purposes. It engages in polling and telemarketing survey research, it operates training and leadership schools, it conducts voter registration within the churches, it encourages members to contact their legislators on certain issues, it makes get-out-the-vote calls during election years to supporters and members.

The Coalition maintains two membership files. The "house file" consists of everyone who has contributed to the Coalition or who has contacted the Coalition in some fashion. In 1992, the house file was used mainly for soliciting contributions, informing supporters about legislative issues, educating supporters about candidates and issues, and encouraging them to vote. The other file is the voter identification database, or "voter file," which consists of names purchased or obtained by the Coalition of people who are believed to be "pro-life" voters, and names obtained from grassroots voter canvassing. The FEC claims that the voter identification database is used to mail voter guides to people in particular districts or states. The Coalition claims that the voter file was "maintained so that when [the Coalition is] mailing [ ] voter guides to a particular district or state, [the voter file] is available

---

3. The FEC claims the Coalition has the additional purpose of influencing elections at the federal, state, and local levels.

to be accessed and mailed if [ ] so desired." CC Ex. 133 at 117. The Coalition claims that it usually does not have the funds to mail to both the voter list and the house list because the voter list now contains almost 1.6 million names. *See id.*

Between 1991 and 1994, the Coalition held four annual Road to Victory conferences. These conferences served educational, informational and organizational purposes with the goal of ultimately seeing election victory for candidates who shared the Coalition's values. The agenda for the conference is set by the Executive Director and the staff of the Coalition. The conference has attracted high-profile speakers such as President Bush in 1992, Vice President Quayle in 1991 as well as Members of Congress and senior executive branch officials.

## B. Administrative Proceedings

On February 27, 1992, the Democratic Party of Virginia filed an administrative complaint with the FEC alleging that the Coalition had violated the FECA. Eight months later the Democratic National Committee also filed a complaint with the FEC against the Coalition, and the FEC merged the two complaints for enforcement purposes. The FECA establishes a multi-step confidential administrative process through which the FEC must go to enforce the Act's provisions. If at the end of that process the FEC has not been able to resolve a matter, it may file a civil action in federal district court. Compliance with many of the administrative requirements is necessary for the Court to have jurisdiction over the matter. In this case, the FEC has complied with all necessary administrative requirements.

While the administrative investigative stage can be quite lengthy in its own right, the process was lengthened in this case by the intervening decision of our Court of Appeals, holding that the Commission's composition violated the principle of separation of powers because the Secretary of the Senate and the Clerk of the House of Representatives, or their designees, were part of the Commission as non-voting *ex officio* members. *See FEC v. NRA Political Victory Fund*, 6 F.3d 821, 824 (D.C.Cir.1993) (*"NRA"*), *cert. dismissed for want of jurisdiction*, 513 U.S. 88, 115 S.Ct. 537, 130 L.Ed.2d 439 (1994). The *NRA* court concluded that the Commission, as then structured, lacked authority to prosecute an enforcement suit.

Following the *NRA* decision, the voting members of the Commission voted to reconstitute itself as a six-member Commission without *ex officio* members, conforming with the Court of Appeals' decision. The new Commission ratified the decision to investigate the Coalition. After finding probable cause and attempting to conciliate with the Commission, the FEC filed this lawsuit in 1996. Shortly after this lawsuit was filed, the Coalition moved for partial dismissal on statute of limitations grounds. That motion was granted in part and denied in part. *See Federal Election Com'n v. The Christian Coalition*, 965 F.Supp. 66, 72 (D.D.C.1997).

Discovery commenced, and was lengthy. On various occasions the Coalition was unable to meet its discovery obligations, requiring that discovery be extended and that certain depositions be reopened. The Coalition's repeated inability to comply with reasonable discovery requests led Magistrate Judge Alan Kay, who oversaw discovery, to impose sanctions. Additionally, in response to an FEC motion, the Coalition abandoned one of its central affirmative defenses, stipulating that it did not qualify for the exemption on corporate expenditures reserved for certain "ideological corporations." When discovery finally closed, the parties filed cross motions for summary judgment.[4]

---

4. The filing of cross motions gave each party an opportunity to argue its case twice. Nonetheless, the parties jointly requested that the page limits on briefing be doubled. While that request was excessive, the Court generously allowed each side to file opening and

## II. Relevant FECA Background

The following background on the legal principles governing federal campaign finance in the Federal Election Campaign Act, 2 U.S.C. §§ 431–455, provides a necessary frame of reference for understanding the facts in this case. Congress enacted the FECA in 1971 in response to revelations during the congressional investigation of the campaign-related activities of senior officials in President Nixon's Administration. The FECA was enacted to prevent "corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office." *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam).

The FECA, as substantially amended in 1974 and 1976, was the most comprehensive regulation of the federal electoral process in history. The 1974 amendments to the Act created the Federal Election Commission to regulate the federal electoral process and to enforce the Act's limitations. Shortly after passage, a constitutional challenge against numerous FECA provisions was launched. That attack culminated in the United States Supreme Court's lengthy per curiam *Buckley* opinion, which provided a partial First Amendment blueprint for restrictions on campaign finance while striking down or scaling back various FECA provisions.

### A. Contributions vs. Expenditures

In the Act Congress sought to restrict campaign "contributions" and "expenditures" equally. However, the *Buckley* Court read the First Amendment to require substantially different treatment of "contributions" and independent "expenditures." The *Buckley* Court observed that "virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Buckley*, 424 U.S. at 19, 96 S.Ct. 612. From that observation, the Court reached its holding that restrictions on campaign contributions and expenditures are restrictions on political speech. *See Buckley*, 424 U.S. at 19, 96 S.Ct. 612. Such restrictions are permissible only if they survive strict judicial scrutiny.[5] After defining and balancing the

---

opposition briefs of 75 pages in length (double spaced, 12 point roman type) and reply briefs of 45 pages. Notwithstanding that copious grant, as was noted by the FEC, counsel for the Coalition ignored the Court's page limits in its brief opposing the FEC's motion for summary judgment by single-spacing certain paragraphs (apparently at random). *See* the Coalition's Opp. Mem. at 8, 21, 32–33, 36, 39, 40, 43, 46, 48, 49, 66, 67. In the interest of expediting this matter, the Court chose not to strike the Coalition's memorandum of law. However, the Court finds such conduct to be reprehensible, and it shall not be tolerated in the future.

5. Under the rhetoric of modern constitutional adjudication, establishing the level of judicial "scrutiny" is an essential first step. Because virtually no right against the government is absolute, each level of "scrutiny" involves a judicial balancing of the government's interests against individuals' rights; the applicable level of scrutiny (and thus the applicable interest-balancing formula) is determined by whether legislation or executive action impinges on an individual's general rights, "qualified" fundamental rights (limited in force by the identity of the right-holder or the nature of the right), or full-fledged fundamental rights. Where general common law or statutory rights are concerned, courts will uphold the questioned action so long as it bears a rational relationship to a legitimate governmental interest. *See Hutchins v. District of Columbia*, —— F.3d ——,——, 1999 WL 397429 *28 (D.C.Cir.1999) (en banc) (Rogers, J., concurring in part and dissenting in part). Where qualified fundamental rights are at issue, courts engage in "intermediate scrutiny," which questions whether the government has advanced an "important" interest that is "substantially related" to the action in question. *Id.* Finally, where the governmental action burdens fundamental rights, the government must identify a "compelling" governmental interest and demonstrate that the action is "narrowly tailored" to advance the government's interest. *Id.*

The term "scrutiny" is potentially misleading because it focuses only on the interest-balancing process, carried out with resort to either normal judicial vision (rational basis), the judicial magnifying glass (intermediate scrutiny), or the judicial microscope (strict

relevant interests at stake, the *Buckley* Court concluded that the First Amendment permitted limits on campaign contributions but not on independent expenditures by individuals.

### 1. Contributions

*Buckley* recognized a compelling governmental interest in preventing corruption, or the appearance of corruption, spawned by large campaign contributions. To determine whether the limitations on contributions and expenditures were narrowly tailored to that interest, the Court considered the degree and type of protected speech burdened by the legislation, as well as the burden on the right of free association. The Court concluded that the limitation on campaign contributions was permissible because such contributions involved only a limited degree of protected speech—"symbolic expression of support," *id.* at 21, 96 S.Ct. 612—and that the legislation was narrowly tailored because it directly addressed its anti-corruption interest, i.e., the specter of large campaign contributions leading to a legislative *quid pro quo. Id.* at 28–29, 96 S.Ct. 612.

### 2. Independent Expenditures—"Express Advocacy"

As to expenditures made independent of any campaign, however, the Court's analysis proceeded in two steps. Of particular significance in this case, the Court first determined that the statutory limit on "expenditures relative to a clearly identified candidate," *see* 18 U.S.C. § 608(e)(1) (repealed), was impermissibly vague. The Court recognized that Congress intended this phrase to sweep broadly, but held that First Amendment concerns overrode congressional intent in the context of *independent expenditures* or else the phrase

"relative to" might be construed to impermissibly limit lobbying and other non-campaign-related political speech. *Buckley,* 424 U.S. at 41–44, 96 S.Ct. 612.

Thus, the Court created the "express advocacy" test by limiting the cap on independent expenditures "relative to" a candidate to apply only to independent expenditures on communications "that in express terms advocate the election or defeat of a clearly identified candidate for federal office." *Buckley,* 424 U.S. at 44, 96 S.Ct. 612. In a footnote that has grown in significance, the Court elaborated: "This construction would limit the application of [§ ] 608(e)(1) to communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat' 'reject'." *Id.* at 47 n. 52, 96 S.Ct. 612; *see also id.* at 80 n. 108, 96 S.Ct. 612.

In the second step, after so narrowing the statute, the *Buckley* Court determined that the spending cap violated the First Amendment because it directly infringed on a speaker's independent political speech while being only tangentially related to the Government's interest in preventing corruption. *Id.* at 47–48, 96 S.Ct. 612. However, the Court sustained § 434's requirement that independent expenditures on communications containing express advocacy be reported to the FEC. *See id.* at 80, 96 S.Ct. 612.

### B. Speech by Corporations and Labor Unions

*Buckley's* analysis did not explicitly extend to the FECA provision limiting corporate and union expenditures at issue in this case, a legal provision with a long history. *See Federal Election Comm'n v.*

scrutiny). But purpose of the "scrutiny" (interest-balancing) is to determine the scope and contours of the substantive limitations that the Constitution places on governmental power.

Thus, in this case, this Court must apply "strict scrutiny" to determine whether the

FEC's interpretation of the FECA is permitted by the substantive limitations of the First Amendment. Interests must be balanced, but the ultimate inquiry is into the reach of First Amendment's guarantees of free speech and free association.

*Massachusetts Citizens For Life*, 479 U.S. 238, 246–48, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) [hereafter *MCFL* ].[6] That provision, § 441b, declares in pertinent part:

It is unlawful for ... any corporation whatever, or any labor organization, to make a *contribution or expenditure* in connection with any [federal election].

2 U.S.C. § 441b(a) (emphasis added). A "contribution or expenditure"

shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, *or any services*, or anything of value ( [except a regular bank loan] ) to any candidate, campaign committee, or political party or organization, *in connection with* any [federal election].

*Id.* § 441b(b)(2) (emphasis added).[7]

In analyzing a First Amendment challenge to § 441b, the *MCFL* Court followed *Buckley*'s two-step analysis. *MCFL* first declared that the "express advocacy" limitation also applies to § 441b's restriction on independent expenditures. *MCFL*, 479

6. The Court had previously found that corporations, although fictitious "persons" under the law, enjoy the full protection of the First Amendment. *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978).

7. The purpose of § 441b's predecessor, former 18 U.S.C. 610, was "to prohibit the use of union or corporate funds for active electioneering directed at the general public on behalf of a candidate in a Federal election." *MCFL*, 479 U.S. at 248, 107 S.Ct. 616 (internal quotation and citation omitted). FECA does not close off all avenues for corporate or union spending on federal elections. A prohibited "contribution or expenditure" does not include the establishment, administration, or solicitation of contributions to a "separate segregated find" (i.e., a PAC) established by a union or corporation. *See* 2 U.S.C. § 441b(b)(2)(C).

8. *See MCFL*, 479 U.S. at 257–60, 107 S.Ct. 616; *see also id.* at 266, 107 S.Ct. 616 (Rehnquist, C.J., concurring in part and dissenting in part); *see also Austin Chamber of Commerce v. Michigan*, 494 U.S. 652, 661, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) ("Although some closely held corporations, just as some publicly held ones, may not have accumulated significant amounts of wealth, they

U.S. at 249, 107 S.Ct. 616. In the second step, the Court reached a different result than in *Buckley* because the nexus between the Government's anti-corruption interest and the ban on corporate and union independent expenditures is much closer than was the case with individuals.[8]

## III. COUNT III: ALLEGED VIOLATION OF § 441B'S BAN ON EXPRESS ADVOCACY

Relying on these holdings of *Buckley* and *MCFL*, the FEC, in Count III, contends that the Coalition violated § 441b by using general treasury funds to finance communications that expressly advocated the election or defeat of a clearly identified candidate on three occasions: (1) a 1992 speech made by the Coalition's Executive Director Ralph Reed in Montana; (2) a 1994 national mailing entitled "Reclaim America"; and (3) a 1994 mailing by the Coalition's Georgia affiliate. The facts, although voluminous, are not genuinely disputed.[9]

receive from the State the special benefits conferred by the corporate structure and present the potential for distorting the political process."); *Federal Election Comm'n v. National Right to Work Comm.*, 459 U.S. 197, 209–210, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) ("[T]he special characteristics of the corporate structure require particularly careful regulation.").

9. The Coalition challenges the majority of the FEC's statement of material facts. While on frequent occasion the Coalition merely supplements the FEC's factual assertion, *see* FED. R. EVID. 106, almost never does the Coalition actually assert that the fact is untrue. Rather, inexplicably, the Coalition objects to the admissibility of nearly every document on which the FEC relies to establish a material fact on the grounds of authenticity and hearsay. This is so even when the Coalition has separately admitted the fact in response to the FEC's requests for admissions, or when the Coalition relies on the same exhibit in support its own motion. The vast majority of these documents were in the possession, custody or control of the Coalition and were produced to the FEC either during discovery or during the administrative phase of this case.

It is true that the FEC has been chastised in other courts for failure to establish the admis-

## A. Reed's 1992 Montana Speech

On January 24 and 25, 1992, Christian Coalition of Montana and the Montana Family Coalition jointly sponsored a conference ("Montana conference") open to the public in Helena, Montana. The invitation to the Montana conference and its agenda listed Ralph Reed as a scheduled speaker and identified him as the "National Executive Director of Christian Coalition." The FEC alleges that the Coalition violated the FECA in connection with Reed's speech because the Coalition made an expenditure from general corporate funds—to fly Reed to Montana and compensate him for his time—and that Reed expressly advocated the defeat of the incumbent, Representative Pat Williams, a member of the Democratic Party who represented Montana's First District in the United States House of Representatives.[10]

When introducing Reed, the moderator reminded the audience "[t]hat we heard [Reed] say last night, he's gonna be here at least two more times before the election." CC Ex. 130 at 2–3. Reed spoke for approximately 45 minutes. His speech was entitled "Address and Challenge."[11]

sibility of its summary judgment exhibits, *see e.g. Federal Election Com'n v. Colorado Republican Fed. Campaign Committee*, 41 F.Supp.2d 1197, 1200 (D.Colo.1999), and the FEC could have made a clearer record to establish that many Coalition documents that appear to have been produced and kept in the ordinary course of business were in fact so kept. *See* Fed.R.Evid. 803(6).

Nonetheless, the Coalition's indiscriminate objections are irresponsible, as the majority are without merit. Cf. FED. R. CIV. P. 11(b)(2), (4). Most of the documents were authenticated through testimony, requests for admission, or otherwise bear sufficient indicia of reliability to be admitted. The Coalition's hearsay objections ignore the fact that many documents are non-hearsay either because they are party admissions, are relied on to show notice or otherwise not for the truth of the matters asserted, and, in limited cases, because the statements are legally significant "verbal acts." In addition, other documents clearly meet the Rule 803(6) hearsay exception.

Relying on the Court's inherent power to preserve the integrity of the adjudicative process in this case, and to deter similar conduct in the future, the Court finds that the Coalition's indiscriminate evidentiary objections amount to a waiver of those objections. The Court may deem the objections to be waived without advance notice or an opportunity to be heard because it is so obvious that a party abuses the judicial system by indiscriminately asserting a blanket, boilerplate objection to every document offered by the opposing party. Nevertheless, assuming *arguendo* that waiver cannot be found without a hearing on the issue and an opportunity to cure, to the extent that the facts set forth in this opinion require reliance on documents to which the Coalition objects, the Court would have overruled the Coalition's objections.

10. Reed attended and spoke at the Montana conference as a representative of the Coalition. Reed was employed by the Coalition as its Executive Director, was paid on a salaried basis, and commonly worked on weekends and evenings, when necessary. The Coalition paid for Reed's airfare from Norfolk, Virginia, to Helena, Montana, to attend the Montana conference, and the Coalition was not reimbursed by any party for this expenditure. The money spent by Christian Coalition to pay for Reed's travel to and attendance at the Montana conference, as well as the money spent to pay for Reed's salary for time attributable to his travel to and attendance at the Montana conference, was not reported to the FEC as an independent expenditure. Some of the time that Reed attended, and traveled to and from, the Montana conference, was during his normal working hours. Reed did not use vacation time or other earned leave time from his position as Executive Director of Christian Coalition in order to travel to and attend the Montana conference.

11. Reed's speech was recorded on videotape. The Coalition produced a copy of the videotape to the FEC during the administrative investigation. A transcript of the videotape was prepared. The Coalition relies on a copy of the transcript in support of its motion for summary judgment (Coalition Ex. 130) yet advances frivolous objections on authenticity and hearsay grounds to the FEC's use of the "corrected copy" of the same transcript which is identical in all material respects. *See* FEC Ex. 85. As has been held, the Coalition has waived its objections, and in any event, Reed's speech is non-hearsay for two independent reasons: (1) it is an admission by a party-opponent, Fed.R.Evid. 801(d)(2); and (2) it is a non-hearsay "verbal act" with respect to the question of whether the speech is "express advocacy," *see* Fed.R.Evid. 801(c)

Reed opened with a partisan jibe at Senator Harkin, a presidential candidate at the time,[12] and then announced that Reed's purpose was "to feed you and nourish you in terms of strategy and tactics for the pro-family movement." *Id.* at 5. Much of the next portion of the speech was dedicated to references to the Bible in conjunction with a cataloguing of numerous perceived social ills. Summing up this portion of the speech, Reed said "[a]nd without getting into advocating election or defeat of anybody, I'd have to say that the last three years or so of policy have not been good ones with respect to pulling us out of this." *Id.* at 16.[13]

Reed then characterized a growing Christian movement rising up to respond to the perceived social ills as an "army" in need of a "strategy." Reed offered "five effective keys to a winning strategy for the pro-family movement that I've drawn from Sun Tsu [author of THE ART OF WAR]." *See id.* at 20–21. The first strategy was "secrecy."

> We're involved in a war. It's not a war fought with bullets. It's a war fought with ballots. .... [Y]ou've got to ... move secretively....
>
> This is sort of the opposite of what the pro-family movement did for most of the 1980s. Here was a typical national pro-family strategy *when it came to knocking off somebody like Pat Williams.* Fly Jerry Falwell or Pat Robertson in, hold a news conference with his opponent in front of a bank of microphones, *announce that Pat Williams is one of your top targets* in the entire nation, and

then give a big bear hug to the other guy and say, this was the guy you were supporting.

*Id.* at 22 (emphasis added). Reed advised that the second strategy was "safety," which he translated into avoiding "the totally unwinnable race." The third principle was to "know yourself and your enemy." He admonished that in the past:

> Too often what we have done as a pro-family movement is gone out and decided we wanted to get somebody because we just couldn't stand their voting record. And that was all. We just didn't like them. We wanted to get rid of them. We didn't do any polling. We didn't do any opposition research.

*Id.* at 31. Reed then gave an example in which the Coalition had applied this principle in a recent state senate election in Virginia: "We knocked off a guy who was about to run for lieutenant governor or attorney general." *Id.* at 32.

In closing, Reed quickly reviewed the fourth and fifth principles (unity and persistence, respectively) and finished with the following remarks:

> And those are the five basic principles of what I think is a winning strategy. And I think if we will do it effectively, if we will move secretly ..., if we will think of safety as important, if we will know ourselves and our enemies, if we will move forward in unity, and if we will be persistent, *victory will be ours. It will be ours here in Montana.* And it will be ours all across America.

---

advisory committee notes (1972) ("The effect is to exclude from hearsay the entire category of 'verbal acts' ... in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights.").

**12.** "The only thing more nauseating than a liberal Democrat is a liberal Democrat running for President, groveling at a Rainbow Coalition meeting, and groveling for votes, seeing who could be more liberal." *Id.* at 4.

**13.** Reed, in the speech, singled out three legislative events as representing bad policy: "A $138 billion tax increase;" "a clean air act," and the "Americans with Disabilities Act." *Id.* at 16. However, in his deposition Reed stated that his reference to "bad policy" referred to the policies Pat Williams had advocated as chairman of the House subcommittee that authorized the National Endowment for the Arts. *See* Reed Dep. (CC Ex. 31) at 640.

And what I said, this is my first time in Montana, but I can assure you, it will not be my last. . . . .

*We're going to see Pat Williams sent bags packing back to Montana in November of this year.*

And I'm going to be here to help you.

Thank you.

*Id.* at 37 (emphasis added). As it turned out, Reed did not return to Montana prior to the general election in November 1992.

## B. "Reclaim America" Mailing

In 1994, the Coalition spent approximately $930,000 to produce and distribute a direct mail package ("Reclaim America mailing") to targeted constituents. The Coalition did not report to the FEC any of its expenditures for the Reclaim America mailing as independent expenditures. The mailing focused on the upcoming general congressional election in 1994. The package was comprised of a six-page letter signed by Pat Robertson as Founder and President of the Coalition; a "1994 National Referendum on the Clinton Presidency"; and a "Christian Coalition Congressional Scorecard." [14]

The FEC argues that the following portions of the Reclaim America package constitute prohibited express advocacy.

### a. Excerpt from Robertson's Second Letter

In fact, *the 1994 elections for Congress . . . will give Americans their first opportunity to deliver their verdict on the Clinton Presidency.* If America's 40 million eligible Christian voters are going to make our voices heard in the elections this November . . . we must

stand together, we must get organized, and we must start now.

FEC Ex. 119 (emphasis added).

### b. Excerpts from Robertson's First Letter

In other words, America's 40 MILLION Christian voters have the potential to. make sweeping changes in our government . . . IF Christians get to the ballot box and IF Christians have accurate information about how their elected representatives are voting.

That's what our RECLAIM AMERICA CAMPAIGN is all about.

Elsewhere in the letter Robertson explained that the Reclaim America mailing was meant to give Christians a "chance to make the politicians in Washington feel the power of the Christian vote."

### c. The Christian Coalition Congressional Scorecard

Robertson's letter indicates that the Coalition publishes its Congressional Scorecard four times per year. Of the two "Scorecards" in the record, each listed and characterized several issues about which Congress had voted, stated the Coalition's position on each, and reported how each incumbent candidate had voted on each one. Each vote was judged with a rating "+ +" or "—", followed by an overall percentage for each Senator and Representative. On the "Scorecard" was an explanation that the "index . . . includes a total score for each member of Congress. A score of 100% means the Congressman supported Christian Coalition's position on every vote. A score of 0% means the Congressman never supported a Christian Coalition position." The names of Mem-

---

14. The FEC asserts that its exhibit 119 is the Reclaim America mailing, which comprises a single mailing. *See* FEC Summ. J. Mem. at 16. It appears as if there may have been two mailings. FEC Exhibit 119 contains two undated cover letters from Robertson that are materially different, *compare id.* FEC 001–0274–79 (noting that "Congressional elections are fast approaching") with FEC 003–3207–

12 ("the 1994 Congressional elections are just a few months away"), each of which is followed by copies of the "Referendum" and "Scorecard." The "Scorecard" following the first letter records votes on 14 measures whereas the "Scorecard" following the second letter records votes on 12 measures (many of which are different from those listed on the first "Scorecard").

bers of Congress from the Republican Party were printed in upper case letters while the names of Members from the Democratic Party were printed in upper and lower case letters. The average score for Republicans was higher than the average score for Democrats.[15]

Robertson's first letter explained that the Coalition's "new CONGRESSIONAL SCORECARD [is] designed to give Christian voters the facts they need to hold their Congressmen accountable." The letter also claimed that the "Scorecard" "will give America's Christian voters the facts they need to distinguish between GOOD and MISGUIDED Congressmen."

### d. Robertson's Solicitation

After alerting the reader to the fact that the Democratic National Committee had filed a complaint with the FEC regarding the Coalition, Robertson's second letter sought monetary gifts to "help [the Coalition] survive the legal attack we're under from the Democratic National Committee, which is trying to close down the Christian Coalition in an effort to silence Christian voices and suppress the Christian vote in November."

### C. Georgia State Coalition—1994 Mailing

The FEC also alleges that the Coalition engaged in express advocacy when, prior to the July 1994, primary election in Georgia, Christian Coalition of Georgia sent a cover letter from Patrick M. Garland,

State Chairman, containing the heading "State Coalition Update—July 1994," accompanied by one of the two versions of the "Christian Coalition Congressional Scorecard" contained in the Reclaim America mailing.[16]

Garland's letter stated in part:

**"The Primary Elections are here!** On Tuesday, July 19, Georgians will nominate Democratic and/or Republican candidates for the offices of: Governor, Lt. Governor, Insurance Commissioner, Congress, Public Service Commissioner, and the State Legislature.

To help you prepare for your trip to the voting booth, we have enclosed a complementary voter ID card. This personalized card lists your Congressional district and your State House and State Senate districts.

We have also enclosed a Congressional Scorecard which you may take to the voting booth. The only incumbent Congressman who has a Primary election is Congressman Newt Gingrich—a Christian Coalition 100 percenter.[17] Make sure that you save this scorecard for November, however, because all other Congressmen are opposed in the General Election.

FEC Ex. 118.

The expenditures made by Christian Coalition of Georgia to print and distribute the Georgia Congressional Scorecard and Georgia Coalition Update were not report-

---

**15.** The Scorecard contained the following disclaimer:

This Scorecard is for informational purposes only and is not intended to influence the outcome of any election. Christian Coalition does not advocate the election or defeat of any candidate, and does not endorse any political party. Scores in this Scorecard are not to be taken as a commentary on the personal faith of individual members of Congress. The information in this Scorecard is provided as a tool to help you more effectively lobby your Congressman and two Senators on issues before the 103rd Congress.

**16.** The Coalition and Christian Coalition of Georgia had signed a letter of agreement in

April, 1991. In the letter of agreement between the Coalition and the Christian Coalition of Georgia, the parties agreed that any public relations effort by Christian Coalition of Georgia using the Christian Coalition name "will be sent to CC national headquarters for approval prior to its use."

**17.** The Coalition concedes that a "Christian Coalition 100 percenter," as that phrase was used in the Georgia Coalition Update, is a person who supported Christian Coalition's position on every vote included in "Scorecard" included in the mailing.

ed to the FEC as independent expenditures. Christian Coalition of Georgia was unable to provide an itemized accounting of the funds spent on the Coalition Update and Congressional Scorecard. It reported spending approximately $50,000 on printing and postage in 1994, but its itemizations were limited.

## IV. APPLYING THE "EXPRESS ADVOCACY" STANDARD

As limited by the Supreme Court, § 441b(a) makes a corporation or labor union's independent expenditure from general treasury funds illegal only if it: (1) pays for a communication; (2) that expressly advocates the election or defeat; (3) of a clearly identified candidate. The most difficult element to apply is the second—"express advocacy." Because this Court finds that application of the second element is dispositive with respect to all three challenged communications, it is either assumed or undisputed that the FEC has established the first and third elements as to all three communications.[18]

18. As to the Montana speech, although there was reference to a clearly identified candidate (Pat Williams), some question arises as to the "payment" element, concerning the scope of Reed's visit and the amount of salary and airfare allocable to the alleged "express advocacy." As to the "Reclaim America" mailing, which refers only to incumbents, a question arises as to whether the "Scorecard's" references to the clearly identified incumbents are references to them as candidates. The same issue applies to the "Scorecards" sent in the Georgia mailing, although the cover letter makes clear reference to former House Speaker Newt Gingrich in his capacity as a candidate.

19. The Court set forth the facts more fully as follows:

The front page of the publication was headlined "EVERYTHING YOU NEED TO KNOW TO VOTE PRO–LIFE," and readers were admonished that "[n]o pro-life candidate can win in November without your vote in September." "VOTE PRO–LIFE" was printed in large bold-faced letters on the back page, and a coupon was provided to be clipped and taken to the polls to remind voters of the name of the "pro-life"

## A. Precedent

The leading decision applying the "express advocacy" test is *MCFL*, 479 U.S. at 249, 107 S.Ct. 616. In *MCFL*, the speech at issue was a "Special Edition" of the newsletter published by Massachusetts Citizens For Life, Inc. Readers were exhorted to "Vote Pro–Life" and were provided with a coupon to take to the voting booth with the names of the "pro-life" candidates.[19] The Court held:

The Edition cannot be regarded as a mere discussion of public issues that by their nature raise the names of certain politicians. Rather, it provides in effect an explicit directive: vote for these (named) candidates. The fact that this message is marginally less direct than "Vote for Smith" does not change its essential nature.

*Id.* at 249, 107 S.Ct. 616.

The *MCFL* Court's succinct holding left open questions as to how the FECA expenditure provisions, as narrowed by the

candidates. Next to the exhortation to vote "pro-life" was a disclaimer: "This special election edition does not represent an endorsement of any particular candidate."

To aid the reader in selecting candidates, the flyer listed the candidates for each state and federal office in every voting district in Massachusetts, and identified each one as either supporting or opposing what MCFL regarded as the correct position on three issues. A "y" indicated that a candidate supported the MCFL view on a particular issue and an "n" indicated that the candidate opposed it. An asterisk was placed next to the names of those incumbents who had made a "special contribution to the unborn in maintaining a 100% pro-life voting record in the state house by actively supporting MCFL legislation." While some 400 candidates were running for office in the primary, the "Special Edition" featured the photographs of only 13. These 13 had received a triple "y" rating, or were identified either as having a 100% favorable voting record or as having stated a position consistent with that of MCFL. No candidate whose photograph was featured had received even one "n" rating. *MCFL*, 479 U.S. at 243–44, 107 S.Ct. 616 (record citation omitted).

"express advocacy" limitation, apply. These include whether "express advocacy" is measured by the speaker's subjective intent or the recipient's objective understanding and whether context outside the communication itself may be considered when divining whether a communication's "essential nature" transcends discussion of issues and public policy and enters the realm of express advocacy.

Most courts that have considered the issue understand *Buckley* and *MCFL* to have separated permissible "issue advocacy" [20] from impermissible "express advocacy" by a "bright line." [21] So-called bright-line rules of law are those that give the clearest possible advance (*ex ante*) guidance to distinguish permissible from impermissible conduct, leaving little room for after-the-fact (*post hoc*) case-by-case considerations. However, even those courts characterizing the "express advocacy" standard as a "bright line" recognize that the context-dependent nature of language introduces ambiguities requiring certain case-specific considerations.[22] These courts nevertheless find that, while factors such as proximity of the communication to an election appear relevant, the "express advocacy" test brightly illuminates the difference between permissible and impermissible communication by prohibiting only those communications that contain specific *words* of advocacy which unmistakably exhort the recipient to support the election or defeat of a clearly identified candidate. *E.g., CAN II*, 110 F.3d at 1051. Under this formulation, the presence of explicit *words* of advocacy is a constitutional requirement. *But see Furgatch*, 807 F.2d at 863 (rejecting a "magic words" approach because "[i]ndependent campaign spenders working on behalf of candidates could remain just beyond the reach of the Act by avoiding certain key words while conveying a message that is unmistakably directed to the election or defeat of a named candidate.") [23]

In moderate contrast to this position is that taken by the Ninth Circuit, which held:

> [S]peech need not include any of the words listed in *Buckley* to be express

---

**20.** The FEC claims that the Coalition's frequent references to "issue advocacy" are without basis in the statute. While technically correct, the term "issue advocacy" is a term of constitutional import, deriving from *Buckley*'s oft-quoted distinction between that broad band of political speech which the Government may not regulate and the narrow band comprising independent expenditures for express advocacy. Indeed, the term has gained regulatory currency as well. *See* 11 C.F.R. § 114.10(b)(1) ("The promotion of political ideas includes issue advocacy....") (1999).

**21.** *E.g., Federal Election Comm'n v. Christian Action Network* ("*CAN II*") 110 F.3d 1049, 1051 (4th Cir.1997); *Maine Right to Life Comm., Inc. v. Federal Election Comm'n* ("*MRLC*"), 914 F.Supp. 8, 12 (D.Me.), *aff'd mem.* 98 F.3d 1 (1st Cir.1996); *cf. Federal Election Comm'n v. Central Long Island Tax Reform Immediately Comm.* ("*CLITRIM*"), 616 F.2d 45, 53 (2d Cir.1980) (en banc) ("[T]he words 'expressly advocating' mean[ ] exactly what they say."); *Kansans for Life, Inc. v. Gaede*, 38 F.Supp.2d 928, 935–36 (D.Kan.1999) (applying "express advocacy" standard to state law and enforcement poli-

cy); *Right to Life of Michigan, Inc. v. Miller*, 23 F.Supp.2d 766, 768 (W.D.Mich.1998) (state law). *But see Federal Election Comm'n v. Furgatch*, 807 F.2d 857, 861 (9th Cir.1987) ("[T]he 'express advocacy' language of *Buckley* and section 431(17) does not draw a bright and unambiguous line.").

**22.** *E.g., CAN II*, 110 F.3d at 1054 (describing without criticizing *Furgatch*'s observation that temporal proximity to an election is relevant to whether words constitute "express advocacy"); *MRLC*, 98 F.3d at 1 (adopting 914 F.Supp. at 11: "[I]t is commonplace that the meaning of words is not fixed, but depends heavily on context as well as the shared assumptions of speaker and listener."); *CLITRIM*, 616 F.2d at 53 (noting absence of references to relevant context such as identity of candidate's party, fact that incumbent is a candidate, or the election for which he is a candidate).

**23.** For example, a corporate- or union-funded poster with a candidate's picture over a drawing of a ballot box with a line through it (as in a symbolic "No Smoking" sign) would fail the test because no "words of advocacy" are used.

advocacy under the Act, but it must, when read as a whole, and with limited reference to external events, be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate.

*Furgatch*, 807 F.2d at 864.[24] This more context-sensitive approach to "express advocacy" is supported by language in *MCFL*, holding that the "Special Edition" at issue "provide[d] *in effect* an explicit directive" and that the fact that it was "marginally less direct than "Vote for Smith" [did] not change its *essential nature.*" *MCFL*, 479 U.S. at 249, 107 S.Ct. 616 (emphasis added).

After the events in this case took place, the FEC promulgated a regulation that quotes, and in some instances extends, *Furgatch*. *See* 11 C.F.R. § 100.22 (1999). That regulation has been held invalid as beyond the scope of the FEC's authority by the First and Fourth Circuits and a District Court in the Second Circuit.[25] In this Court the FEC argues directly from *Furgatch*.

Our Circuit has not had an opportunity to apply the "express advocacy" standard in a reported decision. Indeed the issue seems to appear in this District Court on only a decennial basis. *See NOW*, 713 F.Supp. 428 (D.D.C.1989) (Robinson, C.J.); *Federal Election Comm'n v. American Fed. of State, County and Municipal Employees*, 471 F.Supp. 315 (D.D.C.1979) (Smith, J.).

## B. Synthesis

■ Having considered the relevant precedent, this Court understands the following attributes to be necessary to the application of § 441b's prohibition on independent expenditures containing "express advocacy." First, the communication must in effect contain an explicit directive. *MCFL*, 479 U.S. at 249, 107 S.Ct. 616. That effect is determined first and foremost by the words used. More specifically, the "express advocacy" standard requires focus on the verbs. *See, e.g., Furgatch*, 807 F.2d at 864–65 (when contemplating phrase "don't let him do it," shifting from district court's focus on "it" to "don't let him"). For a communication to contain, in effect, an explicit directive it must use an active verb (or its functional equivalent, e.g., "Smith for Congress" or, perhaps, an unequivocal symbol).

Second, that verb or its immediate equivalent—considered in the context of the entire communication, including its temporal proximity to the election—must unmistakably exhort the reader/viewer/listener to take electoral action to support the election or defeat of a clearly identified candidate. The most obvious electoral action is to vote for or against the candidate.

---

**24.** The *Furgatch* court elaborated:

This standard can be broken into three main components. First, even if it is not presented in the clearest, most explicit language, speech is 'express' for present purposes if its message is unmistakable and unambiguous, suggestive only of one plausible meaning. Second, speech may only be termed 'advocacy' if it presents a clear plea for action, and thus speech that is merely informative is not covered by the Act. Finally, it must be clear what action is advocated. Speech cannot be 'express advocacy of the election or defeat of a clearly identified candidate' when reasonable minds could differ as to whether it encourages a vote for or against a candidate or encourages the reader to take some other kind of action. *Id.*

**25.** *See respectively MRLC*, 98 F.3d at 1; *Federal Election Comm'n v. Christian Action Network*, 92 F.3d 1178 (4th Cir.1996) (unpublished), *aff'g*, 894 F.Supp. 946 (W.D.Va.1995); *Right to Life of Dutchess County v. Federal Election Comm'n*, 6 F.Supp.2d 248, 254 (S.D.N.Y.1998). *But see generally* Michael D. Leffel, Note, *A More Sensible Approach to Regulating Independent Expenditures: Defending the Constitutionality of the FEC's New Express Advocacy Standard*, 95 Mich. L.Rev. 686 (1996); *see also* Scott E. Thomas, *Hot Issues—Have the Courts Cooked the FECA*, 1069 PLI/Corp 547, 550 (1998) (author is FEC Chairman) (describing FEC's decision to continue litigating the validity of its regulation in other Circuits).

But as the *Buckley* Court recognized when it included the verb "support" in its non-exclusive list, *see* 424 U.S. at 44 n. 52, 96 S.Ct. 612, express advocacy also includes verbs that exhort one to campaign for, or contribute to, a clearly identified candidate.[26]

Finally, application of the "express advocacy" standard is, as former Chief Judge Aubrey E. Robinson, Jr. held, a pure question of law. *See NOW*, 713 F.Supp. at 433. While in other contexts application of such a legal standard would likely be considered a mixed question of law and fact, the First Amendment requires that the issue of whether a reasonable person would understand a communication to expressly advocate a candidate's election or defeat must be decided solely as a matter of law. *Cf. Bose Corp. v. Consumers Union of Am.*, 466 U.S. 485, 505–06, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). The only predicate factual determinations are identification of the speaker and the communication's contents. Once those have been made, a communication can be held to contain express advocacy only if no reasonable person could understand the speech in question—and in particular the verbs in question—to, in effect, contain an explicit directive to take electoral action in support of the election or defeat of a clearly identified candidate. *See MCFL*, 479 U.S. at 249, 107 S.Ct. 616, *cf* FED. R. Civ. P. 12(b)(6), 50(a), 56(c).

Thus, the "express advocacy" standard covers only a narrow class of communications. While some have complained that

"express advocacy" cannot be so limited as to be easily avoided by linguistic sleight-of-hand, *e.g. Furgatch*, 807 F.2d at 863; Thomas, *Courts Cooked the FECA?*, 1069 PLI/Corp at 554, this Court must conclude that that is precisely how the Supreme Court has narrowed the Act. In *Buckley*, the Court held that, as written, the FECA had too much bite. The Court recognized that the result of its narrowing construction rendered the FECA's limitations on independent expenditures largely toothless:

> It would naively underestimate the ingenuity and resourcefulness of persons and groups desiring to buy influence to believe that they would have much difficulty devising expenditures that skirted the restriction on express advocacy of election or defeat but nevertheless benefited the candidate's campaign.

*Buckley*, 424 U.S. at 45, 96 S.Ct. 612.[27]

## C. Application

Turning to the three alleged acts of "express advocacy" at issue in this case, the Court finds that with respect to two communications, Reed's Montana speech and the "Reclaim American" mailing, the Coalition steered clear of § 441b(a)'s prohibition. However, the Coalition's Georgia affiliate, for whose speech the Coalition is responsible in this action, engaged in prohibited express advocacy.

### 1. Reed's Montana Speech

■ Reed's speech was made ten months before the 1992 general election.

---

26. With respect to this attribute, the express advocacy standard's so-called bright line may often blur. *Compare Furgatch*, 807 F.2d at 864–65 (holding that phrase "Don't let him do it" in newspaper advertisement referring to President Carter, released less than one week before the 1980 general election, was express advocacy) *with MRLC*, 914 F.Supp. at 12 (stating that on the facts of *Furgatch*, newspaper advertisement was not express advocacy). Given the rich political lexicon that has flourished under the First Amendment, numerous verbs are available to those wishing to expressly advocate electoral action. A far wider linguistic range remains available to those

wishing to influence the outcome of an election without engaging in express advocacy. Even so, no matter how bright the line, the incentives are considerable for those seeking to test the FECA's limits, which is why even under a bright-line standard an express-advocacy case may be "a very close call." *See Furgatch*, 807 F.2d at 861.

27. Though "express advocacy" is narrow and easily avoided, some groups have nevertheless crossed the line after *Buckley*. *E.g.*, *MCFL*, 479 U.S. at 249, 107 S.Ct. 616.

When introducing Reed, the moderator announced that Reed would twice return before the election, providing some context that would raise expectations that Reed's speech was to be election-related. As it turned out, a very large portion of the speech focused on issues that were not directly related to the election by any measure.

There were, however, some explicit references to the Democratic incumbent, Pat Williams. It can be readily inferred that Reed knew of the "express advocacy" limitation on his speech, *e.g.*, CC Ex. 130 at 16 ("without getting into advocating the election or defeat of anybody"), and Reed carefully avoided such advocacy. For example, some of Reed's verb choices, if phrased a bit differently, may well have crossed into express advocacy: "Here was a typical national pro-family strategy *when it came to knocking off somebody like Pat Williams.*" CC Ex. 130 at 22 (emphasis added). Although implicit, Reed avoided providing an explicit directive to "knock off" Pat Williams.[28] Reed then described how in the past members of the "movement" "just wanted to get rid of" candidates they did not like, but that statement was descriptive rather than prescriptive and was not made in relation to Pat Williams or any other clearly identified candidate.

Finally, Reed closed by predicting that in the war to be "fought with ballots:"

"[Victory] *will be ours here in Montana.* And it will be ours all across America. . . . . *We're going to see Pat Williams sent bags packing back to Montana in November of this year.* And I'm going to be here to help you."

CC Ex. 130 at 37. Although the implicit message is unmistakable, in explicit terms this is prophecy rather than advocacy. Reed predicts that victory "will be" ours and that "[w]e're going to see" Pat Williams defeated in the November election. Neither of these verbs expressly directs the audience to do anything; the speaker has announced that this will come to be without any further action. Making the issue closer is Reed's final statement that he would return "to help you." For Reed to "help" there must be some action taking place for him to assist. However, that action—"sending" the candidate "bags packing"—comes just shy of referring to the campaigning and voting against Pat Williams necessary to bring that about. Though the message is clear, it requires one inferential step too many to be unequivocally considered an explicit directive.

Bound, as this Court is, by *Buckley* and *MCFL,* it can only be concluded that Reed exhibited precisely the "ingenuity and resourcefulness" in his verb choice that the *Buckley* Court envisioned possible to circumvent the prohibition on express advocacy. As others have acknowledged, results such as this appear unsatisfyingly formalistic, allowing precisely the sort of communications Congress sought to prohibit to remain immune from liability. *E.g.,* MRLC, 914 F.Supp. at 12. But the Supreme Court felt that the First Amendment required a choice between a toothless provision and one with an overbite; results such as this flow directly from that choice.

## 2. Reclaim America

■ Robertson's second cover letter in the Reclaim America mailing explicitly refers to "the 1994 elections for Congress" and explains that "If Christian voters . . .

28. The verb "knock off" someone has various slang connotations, such as to kill, *see United States v. Gomez,* 92 F.3d 770, 772 (9th Cir. 1996) (judicial slang) (Kozinski, J.) or to expose, *see Tavoulareas v. Piro,* 817 F.2d 762, 795 (D.C.Cir.1987) (en banc) (journalist's slang). To defeat in an election is not among the more common. *See, e.g.* WEBSTER's II NEW RIVERSIDE UNIVERSITY DICTIO-NARY 668 (1994) (providing six informal or slang definitions of "knock off," none of which include electoral defeat). Nonetheless, Reed subsequently provided context which made clear that his discussion of "knocking off . . . Pat Williams" referred to defeating Williams in an election. *See* CC Ex. 130 at 32 ("We knocked off a guy who was about to run for lieutenant governor or attorney general.").

are going to make our voices heard in the elections this November ... we must stand together, we must get organized, and we must start now." While acknowledging that this expression by itself does not refer to clearly identified candidates, the FEC argues that when read in conjunction with the "Christian Coalition Congressional Scorecard," Robertson's statements can only be understood to direct the reader to support the election of those incumbents rated favorably in the Scorecard and the defeat of those rated unfavorably in the November 1994 elections.

This Court cannot agree for two reasons. First, it is true that certain explicit directives are present: "stand together," "get organized," "start now" all for the purpose of "mak[ing] our voices heard in the elections." It is likely that the reader is to make his voice be heard by voting. But in the context of the entire mailing, which focuses on the importance of raising the profile of issues important to "Christian voters," a reasonable person could understand Robertson's statement to be a directive to engage in issue advocacy with all candidates in the upcoming election. Second, the "Scorecard" resembles both the John Birch Society publication at issue in *CLITRIM* (which did not contain express advocacy) and the "Special Edition" in *MCFL* (which did). It informs the reader as to how a Member of Congress voted on select bills and how the Coalition believes he should have voted. Unlike the "Special Edition," however, the Scorecard does not identify which incumbents are candidates in the 1994 elections, nor does it provide a baseline level of agreement indicating the Coalition's electoral endorsement. *Cf. MCFL*, 479 U.S. at 243–44, 107 S.Ct. 616. For example, while a preference for the Republican incumbents is clearly implied, a reasonable reader would not know whether the Coalition sought the election or defeat of an incumbent who agreed with the Coalition 59 percent of the time on the issues selected without knowing how the opponent rated.

The same problem plagues the FEC's argument with respect to Robertson's statement that "Christian voters have the potential to make sweeping changes in our government ... IF Christians get to the ballot box and IF Christians have accurate information about how their elected representatives are voting." While these voters "have the potential to make sweeping changes" by going to the ballot box, neither Robertson's letter nor the Scorecard explicitly direct the reader as to how to vote in any given election. Similarly, Robertson's statement that the upcoming elections represent a "chance to make the politicians in Washington feel the power of the Christian vote" does not explicitly direct the reader as to what action is necessary to "make the politicians ... feel" the power.

As to the Scorecard itself, for the reasons stated, it does not contain an explicit directive to take specified electoral action. Robertson's first letter explained that the Coalition's "new CONGRESSIONAL SCORECARD [is] designed to give Christian voters the facts they need to hold their Congressmen accountable," explaining elsewhere that the Scorecard "will give America's Christian voters the facts they need to distinguish between GOOD and MISGUIDED Congressmen." It may well be that the implicit message is that "Christian voters" should "hold their Congressmen accountable" and "distinguish" which Congressmen support the Coalition's views by voting in favor of those with a high percentage of agreement and in favor of the opponent of those with a low percentage of agreement. But in the context of the entire communication, these calls to action can also be understood to be exhorting the reader to lobby incumbents on certain issues. Even if it were unmistakable that the Scorecard, in context, was an explicit directive, it remains unclear precisely what electoral action with respect to which incumbents is contemplated.

Finally, Robertson's second cover letter exhorting the reader to "help [the Coali-

tion] survive the legal attack we're under from the Democratic National Committee, which is trying to close down the Christian Coalition in an effort to silence Christian voices and suppress the Christian vote in November." cannot be said to direct the reader to take electoral action. The statement seeks funds to provide support for the Coalition. In the context of the entire mailing, it is not "express advocacy."

### 3. Georgia Mailing

██ Unlike the above two communications, the Georgia mailing was expressly directed at the reader-as-voter. The cover letter announces that "The Primary Elections are here!" and then provides two items "[t]o help you prepare for your trip to the voting booth." The second item was the above-discussed "Congressional Scorecard which you may take to the voting booth." While the Scorecard leaves ambiguous which candidates the Coalition supports, the following sentence of the letter removed all doubt about the purpose of the Coalition's mailing with respect to one election.

> The only incumbent Congressman who has a Primary election is Congressman Newt Gingrich—a Christian Coalition 100 percenter. Make sure that you save this scorecard for November, *however,* because all other Congressmen are opposed in the General Election.

FEC Ex. 118 (emphasis added). The Coalition concedes that a reasonable reader could only have understood the term "Christian Coalition 100 percenter" as describing a congressional incumbent who supported Christian Coalition's position on every vote noted in the "Scorecard" included in the mailing. Moreover, use of the word "however" is significant. It distinguishes how the reader should treat the Scorecard with respect to the primary and general elections. After explaining that the Scorecard was for use in the voting booth, the letter makes clear that the reader need not bring it for the congressional primary election because only one incum-

bent is being challenged, Newt Gingrich, and he is a "100 percenter." The letter does not mention the name of Gingrich's challenger. The unmistakable meaning of the letter is that because Newt Gingrich has voted as the Coalition would have wanted him to on every vote the Coalition considered significant, the reader should vote for him in the primary election. "However," with respect to the general election, all other incumbents faced contested elections, requiring reference to the Scorecard.

While marginally less direct that saying "Vote for Newt Gingrich," the letter in effect is explicit that the reader should take with him to the voting booth the knowledge that Speaker Gingrich was a "Christian Coalition 100 percenter" and therefore the reader should vote for him. While the "express advocacy" standard is susceptible of circumvention by all manner of linguistic artifice, merely changing the verb "vote" into the noun, "trip to the voting booth" is insufficient to escape the limited reach of "express advocacy."

### 4. The *MCFL* Exception

Under *MCFL*, once it has been determined that a corporation has violated § 441b(a) by making independent expenditures for "express advocacy," a second inquiry with respect to certain "ideological corporations" is appropriate to determine whether § 441b is unconstitutional as applied to such a corporation. In *MCFL*, a slim majority held that § 441b cannot apply to a corporation that (1) "was formed for the express purpose of promoting political ideas;" (2) "has no shareholders or other persons affiliated so as to have a claim on its assets or earnings;" and (3) "was not established by a business corporation or labor union and [has as] its policy not to accept contributions from such entities." *See MCFL,* 479 U.S. at 263–64, 107 S.Ct. 616; *id.* at 265–66, 107 S.Ct. 616 (O'Connor, J., concurring in part and con-

curring in the judgment).[29] Subsequently, a sharply divided Supreme Court held that the *MCFL* exception does not extend to a non-profit corporation which was organized for numerous non-political purposes, had numerous business corporations as members, and which relied heavily on financial input from business corporations. *Austin*, 494 U.S. at 661–665, 110 S.Ct. 1391.

In this case, the Coalition asserted the *MCFL* exception as an affirmative defense and counterclaim. However, during discovery the Coalition was unable to, or deliberately chose not to, provide the FEC with responsive information concerning its eligibility for the *MCFL* exception. In response to a motion by the FEC, the Coalition dropped its *MCFL* defense and stipulated:

> The Christian Coalition will not attempt to reassert any affirmative defense or counterclaim in this litigation based on the holding of [*MCFL*]. This stipulation and order will apply only to this litigation and The Christian Coalition is not precluded in any future litigation from seeking to prove such defense or counterclaim.

*See* Stip. and Order of Feb. 17, 1998 ¶ 1. Regardless of whether the *MCFL* defense is properly asserted by affirmative defense or counterclaim (in which case the party asserting the defense bears the burden of proof), the Court understands the stipulation to mean that the parties agree that § 441b can constitutionally be applied to the Coalition. Consequently, because one of the three communications complained of contains prohibited "express advocacy," the FEC's motion as to Count III will be granted in part and denied in part, as will the Coalition's.

---

29. The FEC subsequently promulgated 11 C.F.R. § 114.10 to codify the *MCFL* exemption. That regulation has been held partially invalid in the Eighth Circuit on the ground that it provides narrower protection than the

## V. COUNTS I AND II: FACTS CONCERNING COORDINATED EXPENDITURES

In addition to alleging that the Coalition engaged in prohibited express advocacy, the FEC also alleges that the Coalition violated the FECA in relation to other communications—principally its voter guides. The FEC acknowledges that these guides, which compare candidates' positions on select issues, did not contain express advocacy. However, the FEC asserts that the voter guides were not protected independent expenditures because the Coalition shared information with various campaigns, including the 1992 reelection campaign of President Bush, to such an extent that the Coalition voter guides should be treated for FECA purposes as literature distributed on behalf of the campaign and paid for by the Coalition. On this view, the Coalition's expenditures on its voter guides were illegal in-kind corporate contributions.

### A. Expenditures for 1992 Presidential Election

President George Bush and Pat Robertson are both the sons of United States Senators. They came to know each other while Bush was Vice President. At Bush's invitation, Robertson joined him in a relief mission to Sudan in 1985. In 1988, then-Vice President Bush and Robertson both sought the Republican nomination to run for President of the United States. After Robertson withdrew from the race, he endorsed Bush's candidacy and spoke on Bush's behalf on several occasions, including at the 1988 Republican National Convention in New Orleans. Bush and Robertson each testified that they were "friends." *See* FEC Ex. 7 (Bush Dep.) at 11; FEC Ex. 63 (Robertson Dep.) at 74.

---

First Amendment affords under *MCFL. See Minnesota Citizens Concerned for Life v. Federal Election Comm'n*, 113 F.3d 129, 133 (8th Cir.1997).

George Bush was elected President of the United States in the November 1988 general election. President Bush and Vice President Quayle were candidates for re-election in 1992.[30]

In late 1990 or early 1991, Robertson contacted then-White House Chief of Staff John Sununu and requested a meeting with President Bush. Robertson subsequently met with President Bush, Sununu and Leigh Ann Metzger, Deputy Assistant to the President for Public Liaison, in the Oval Office on January 9, 1991, immediately prior to the Persian Gulf War.

During the meeting, Robertson offered his personal support for Bush's reelection campaign and pledged to support the President's reelection efforts in 1992. On the same day, Reed sent a brief follow-up letter on Christian Coalition stationery to Metzger. See FEC Ex. 035–0112 ("Pat said the meeting with the President today went very well. We are looking forward to helping in any way we can."). Robertson publicly endorsed Bush's candidacy for reelection in early 1991.

Despite Robertson's personal support for President Bush, the Coalition continued to vigorously lobby the Administration. For example, in April 25, 1991, Reed wrote to Special Assistant to the President Ronald Kaufman concerning funding by the National Endowment for the Arts of art the Coalition considered to be offensive. After advising Kaufman of the Coalition's lobbying of Governor Chiles in Florida concerning state funding of similar projects, Reed chastised: "It is somewhat ironic that we are getting more action on this issue from a liberal Democratic Governor than we have seen out of the Bush administration." FEC Ex. 035–0255.

At a June 26, 1991 Coalition Board of Directors meeting, the Board identified as strategic goals the need to (1) control the Republican National Convention, to prevent the party from removing the "pro-life plank" from its platform; (2) control the Republican National Committee for the same reasons; and (3) distribute voter guides in "swing" senatorial elections; that is, in elections that were considered close.

The Coalition's focus on voter guide distribution had grown. The Coalition had distributed voter guides in seven states during the 1990 elections and in two states in 1991. The Coalition had ambitious plans to distribute voter guides nationwide during the 1992 elections. In an August 1991 memorandum to the Coalition's state directors entitled "Legal Compliance In The Printing And Distribution Of Voter Guides," Reed cautioned that because the state affiliates were corporations, Coalition-funded voter guides could not expressly advocate the election or defeat of specific candidates. Reed also advised that voter guides not be distributed only in churches and that voter guides include candidate positions on ten to twelve issues. Reed informed them of the *MCFL* exception for independent expenditures on express advocacy but warned:

> [U]nder FEC law and most state election laws, the expenditure must be truly independent, which generally means no communication, coordination, or cooperation with the candidate, the campaign, or an officer or staff member of the campaign. This often places unrealistic strictures on grassroots volunteer organizations (whose members are often also working on behalf of the candidate as volunteers). It also places you at the mercy of the FEC or state elections regulatory agency to determine whether or not you have communicated with or coordinated your activities with the candidate or his campaign.

FEC Ex. 004–1350–52.

In November 1991, the Coalition sponsored its first annual "Road to Victory"

---

**30.** Bush–Quayle '92 Primary Committee, Inc. was the authorized political committee of President Bush and Vice President Quayle for their 1992 campaign for the nomination of the Republican Party for President and Vice-President of the United States. Bush–Quayle '92 General Committee, Inc. was the authorized political committee for the 1992 general election campaign. *See* 2 U.S.C. §§ 431(4)-(6).

conference in Virginia Beach, Virginia. At Robertson's invitation, Vice President Quayle addressed the conference. Reed consulted with Quayle's speechwriter and spoke in general terms about what Quayle would say. In his opening remarks, Quayle stated: "[B]ecause of you, and your dedication, and your commitment, once again you will join me, Pat and others in making sure that the liberals are defeated and George Bush is elected to the Presidency once again." FEC Ex. 87 at 13.[31]

In late 1991 and early 1992, Robertson lobbied various senior officials of the Bush–Quayle '92 campaign, such as its chairman, Robert Teeter, and campaign manager, Fred Malek, to appoint Coalition members to leadership positions in the campaign within their respective states. On February 11, 1992, shortly before President Bush announced his candidacy for reelection, Robertson met privately with the President. Metzger met with Robertson immediately thereafter and recorded her understanding in a memorandum to Chief of Staff Samuel Skinner that Robertson had raised issues such as "education choice, pro-life platform for the GOP convention, and specific pro-family economic proposals." *See* FEC Ex. 035–000095. In the memorandum to Skinner, Metzger advised that Robertson sought to meet with Skinner to discuss, among other things, a:

> Proposal for a private, quiet meeting with 10–12 key evangelical leaders in Chicago on September 25th. The purpose of this would be to bring in several leaders who have expressed a desire to distribute the Christian Coalition voter

guides. Many of these leaders for one reason or another have never meet [sic] with the President and this would solidify their commitment to participate in the program.

*Id.*

The Republican party presidential primary elections began in February 1992. One of the early or "second wave" primary elections was the March 3, 1992 election in Georgia. Bush–Quayle '92 viewed the Georgia primary election to be of particular importance for two reasons. First, President Bush was being challenged by Patrick Buchanan in Georgia. Bush–Quayle '92 viewed Buchanan as appealing to "the Christian Evangelical voter," a constituency the Bush campaign considered important. Second, the Georgia election would be viewed as a bellwether for the eleven primary elections scheduled for "Super Tuesday" on March 10, 1992.

To counteract the Buchanan challenge in Georgia, Bush–Quayle '92 sought the endorsement of leaders that would appeal to the "Christian Evangelical voter," including Pat Robertson, who could influence a number of voters by virtue of his role as a television personality and his leadership of the Coalition. Robertson authorized Bush–Quayle '92 to send a February 27, 1992 letter over Robertson's signature expressly advocating Bush's election in the Georgia primary, which was less than a week away, and in the November general election.[32] The campaign paid for the production and distribution of the letter.

---

**31.** In a Conciliation Agreement reached with the FEC, the Bush–Quayle Committee conceded that Quayle's express advocacy of the reelection of President Bush made this a campaign appearance for which the campaign should have provided travel rather than an official appearance. The Committee agreed to reimburse the Government for part of Quayle's travel expenses on Air Force Two.

**32.** The letter stated in part:

> The question that is burning in our hearts now is simple: "What should we do in the 1992 Georgia primary and general election

> to insure the long range triumph of our values?"
>
> . . . .
>
> In my opinion, the best course for us is to negotiate with President Bush and his staff tangible, continuing support on our issues, then show the Democrats and the nation that the Republican party is unified and has no intentions of losing the White House in November.
>
> For the good of America and the ultimate triumph of our issues, I have prayerfully decided to support George Bush now and in the general election in November. I

Bush–Quayle '92 paid the Coalition $752.73 to rent the Georgia portion of the Coalition's "house file" mailing list for use in distributing the February 27 letter. This was one of the first, if not the first, times the Coalition rented its house file mailing list to an outside group.

In the February 27, 1992 advocacy letter, Robertson left the capacity in which he signed ambiguous. He is neither explicitly identified as the head of the Coalition or the Christian Broadcasting Network, nor is it explicit that Robertson wrote only as a private citizen. A subsequent press release on Coalition letterhead stated:

> Robertson endorsed the Bush/Quayle ticket in the Republican Party primaries. Through the Christian Coalition, a grassroots citizen activist organization with 250,000 members, Robertson has mobilized activists to turn out the largest Christian vote in American history.

FEC Ex. 037–0161.

On "Super Tuesday," Robertson faxed a letter written in his capacity as President of the Coalition on Coalition stationery to Chief of Staff Skinner referencing a previous conversation "just prior to my mailing the letter in support of President Bush to my supporters in Georgia," and responding to Skinner's request for "any names I had for your review in filling positions in the Administration." FEC Ex. 035–0069.

Within the next two weeks, Robertson and Reed met with White House Personnel Director Constance Homer and her assistant, Les Csorba. In preparation for the meeting Csorba sent Homer a memorandum stating:

> I assume Pat wants the opportunity to meet you and discuss some personnel issues that are important to him, like the NEA and the FCC. Apparently he and Skinner struck a deal about his timely support for the President for some influence in the appointment process.

> hope that you will join me on March 3rd in the Georgia Primary.

FEC Ex. 035–0246 & FEC Ex. 109 (Csorba Decl.) ¶ 9. Csorba cannot recall what was discussed at the meeting, and Robertson denied having reached an understanding with Skinner exchanging his endorsement for influence in the Administration's appointment process.

At the California Republican Convention, Robertson and Reed met with Charles Black, a senior advisor to the Bush campaign, to discuss possible ways to motivate religious conservatives to support candidate Bush. Shortly after the meeting, on April 3, 1992, Reed, as Executive Director of the Coalition, sent Black a letter suggesting 53 individuals as possible candidates to serve as California delegates to the 1992 national Republican Convention. Throughout the Spring and Summer of 1992, Robertson and Reed lobbied senior campaign officials to appoint Coalition members as Bush–Quayle '92 co-chairs in their respective states. *E.g.,* FEC Ex. 023–0278; FEC Ex. 023–0270. Some letters in this regard were written on Coalition stationery. The effort was quite successful. Bush–Quayle '92 appointed a number of the individuals suggested by Reed and Robertson as state co-chairs.

By April 1992, the Coalition's plans for its ambitious voter guide and "get out the vote" project were well formed, although the target total appeared to remain in flux. For example, in a letter to a grant applicant, Reed wrote:

> As you are probably aware, Christian Coalition is planning to distribute 30 million Voter Guides in the churches in 1992, and make 2 million calls to Christians to get them out to the polls. The Voter Guides will cost me approximately 1 million dollars, beyond my general operating budget.

FEC Ex. 042–0032. Reed's notes from an April 28, 1992 meeting with the Coalition's Field Director, Guy Rodgers, indicate discussion of "40 million voter guides" and "2

FEC Ex. 003–1763.

million ID'd voters" and "2 million phone calls/letters." FEC Ex. 065–0013. Also in April 1992, at Reed's suggestion, John Wheeler, editor of the Coalition's newspaper, wrote to President Bush and Vice President Quayle requesting an interview for use, among other things, in the Coalition's "25 million" voter guides. The Vice President granted an interview. On May 1, 1992, Reed traveled to Washington, D.C. at Coalition expense to meet with Mary Matalin, Bush–Quayle '92's political director. Reed's notes from the meeting include reference to "voter guides—40 million." *See* FEC Ex. 065–0016 & FEC Ex. 61 (Reed Dep.) at 392–93.

Throughout the presidential campaign, Reed and Robertson had frequent contact with Bush campaign officials. While Robertson had declined Bush–Quayle '92's offer of the chairmanship of a campaign steering committee, Reed served as co-chair of the campaign's "pro-family" steering committee, which had as one of its purposes to discuss what could be done to assist Bush–Quayle among "pro-family" voters. In June 1992, Reed flew to Washington, D.C. at the Coalition's expense, to attend a steering committee meeting.

Throughout the campaign, Reed provided Bush–Quayle '92 with strategic and other campaign-related advice. On June 2, 1992, the day of the California primary election, Robertson conducted a nationwide telephone poll of the audience of his "700 Club" television program asking them to express a presidential preference. That day, Reed sent a memorandum to Bush–Quayle '92 Chairman Teeter on Coalition stationery stating that the poll results were 57 percent for President Bush; 40 percent for independent candidate Ross Perot; and three percent for then-Governor Clinton. Reed wrote:

Exit polls in 1988 showed Bush pulling 81% from these same voters. If he only gets 50–60%, he is gone.

We are ready and willing to help shore up this base. Now that we are past the primary season we need to come up with a strategy to rebuild bridges among these voters for the general. Hope to talk to you soon about what can be done—the sooner the better.

FEC Ex. 023–0368.

Campaign Chairman Teeter was aware that the Coalition intended to distribute millions of Coalition voter guides in churches nationwide and that the guides would show President Bush's support or opposition of issues to be more compatible with the views of the "Evangelical voter" than would be the positions shown for then-Governor Clinton. Teeter believed that the Coalition voter guides would have the effect of causing a greater number of voters to go to the polls and vote for the Bush–Quayle ticket than would have gone in the absence of the guides. Teeter testified that this was his general understanding, but he had no input into, or advance knowledge of, the specific issues that the Coalition selected for its 1992 presidential voter guide.

In the late Spring of 1992, the Coalition had communicated to the campaign that it would invite President Bush to address the Coalition's September 1992 Road to Victory conference to be held in Virginia Beach, Virginia. He was also invited at some point to attend a fundraising event in connection with the conference. Campaign official Robert Heckman prepared a June 3, 1992 memorandum entitled " 'Outside' Programs/Proposals" listing some outstanding invitations to the President. The first of these was:

Robertson/Christian Coalition

(involves 40 million voter guides, 2 million phone contacts for I.D./GOTV, building of master list)

Cost: Voter Guides—$500,000

ID/GOTV calls—$1,000,000

FEC Ex. 023–000449.[33] The official invitation was sent on June 9 and it references

<hr>

**33.** Attached to this memo was a second page entitled "Potential Funding Mechanisms."

the Coalition's intention to distribute "40 million non-partisan voter guides in churches prior to Election Day." FEC Ex. 023–0244. President Bush attended the conference and the fundraising event. Funds raised at the event were deposited into the Coalition's general treasury.

In June 1992, Robertson and Reed contacted the campaign and the White House in parallel fashion. Robertson wrote to Bush Administration officials, including Education Secretary Lamar Alexander, urging the President to veto education-related legislation pending in Congress and to support a "G.I. Bill for Kids." Meanwhile, Reed sent another campaign advice memorandum to Teeter, Matalin, and Mimi Dawson arguing that the President had to take certain policy stands, to employ rhetoric more commonly associated with Vice President Quayle, and include conservative Christians in visible positions in the campaign and in the Administration. Matalin sent an internal memorandum to Dawson and Mary Lukens stating:

> The essence of this plan is already underway: closer attention to evangelicals/rc's at White House / on trips; We have incorporated all but three of Ralph's people into our structures in the states; Lukens + Betteria are working to schedule the VA. Beach trip.

> As for rhetoric, every speech I hear, Bush does the Quayle rap. In any event, there's nothing in here we don't know or aren't working on. The VA Beach Trip and $500,000 (ha ha) will help—

FEC Ex. 023–0535.

In July 1992, senior campaign officials traveled to Virginia Beach to meet with Robertson and Reed. Reed had prepared

The second item was "CC September Option" with handwritten notes " VA Beach FR (POTUS) could raise 500,000" "$ could go to #1." The document was produced to the FEC by the Republican National Committee pursuant to subpoena, but the FEC was unable to find a witness that would claim authorship of the typewritten portion of the second page. The FEC draws the inference that the Bush

and distributed an agenda for the meeting that included discussion of "Voter Guide Printing and Distribution." FEC Ex. 023–000400. The witnesses who attended the meeting testified that they could not recall what was discussed at the meeting. However, Matalin's contemporaneous notes, written on the back of a copy of Reed's agenda, indicate that the sixth item discussed was

> Voter Guides—40 M guides
> — questionnaires out to cand.
> 100,000 churches
> Christian ldrs send letter to denominations w/ tear off to order tree guides
> — phone tree per co.

FEC Ex. 023–000402; FEC Ex. 45 (Matalin Dep.) at 111–14.

On July 23, 1992, the week after the Virginia Beach meeting, Pat Robertson conducted a videotaped interview of President Bush in the Old Executive Office Building. The interview was for broadcast on Robertson's "700 Club" television program. The White House briefing memorandum to the President indicated that portions of the interview also would be used on the Coalition's 25 million voter guides to be distributed at 100,000 churches.

In a series of communications that departed from standard procedure at both the "700 Club" and the White House, the campaign, through Matalin, suggested to Robertson questions that might be asked in the interview. Similarly, the Coalition, through Reed, provided the White House with both suggested questions (which was common) and answers (which was not). Reed's memorandum states that:

campaign discussed President Bush (POTUS being the commonly used White House acronym for "President Of The United States") attending the Coalition's fundraiser and raising the $500,000 necessary for the Coalition's voter guides. The FEC was unable to locate a witness to endorse or refute this interpretation.

ALL THE ANSWERS ARE SIMPLY SUGGESTIONS. BUT THE LANGUAGE IN QUESTIONS 1,6, AND 8 IS VERY SPECIFIC TO THIS CONSTITUENCY. WE STRONGLY RECOMMEND NO MAJOR REVISIONS IN THIS LANGUAGE.

FEC Ex. 030–0303. The interview took place, but it is unclear which, if any, of Reed's suggested answers President Bush adopted.

Contacts between the Coalition and the Bush campaign and the Bush Administration continued through the Autumn of 1992. In advance of the Republican National Convention, Reed was active in advocating that the Republican Party maintain its public opposition to abortion. Robertson was a delegate to the Republican National Convention, held in Houston, Texas. Robertson also gave a speech at the Convention. In September 1992, Vice President Quayle attended a number of Coalition-related fundraising events. On September 11, Bush addressed the Coalition's second Road to Victory conference.

In the Fall of 1992, James Baker, III, came to play a more prominent role in the Bush–Quayle campaign. Baker, who had been serving as the Secretary of State, became White House Chief of Staff so as to have a greater hand in the dealings between the Bush Administration and Bush–Quayle '92. Baker was a member of the "Core Group" through which all major campaign-related decisions passed. In a brief meeting, Baker advised Robertson that in the final stage of the presidential campaign, President Bush would be focusing on economic issues and downplaying the social issues about which Robertson was most fervent. Baker also spoke of fishing with the President in Montana. Robertson considered Baker to be "disengaged."

In a subsequent telephone conversation, Robertson mentioned to Baker the Coalition's plans to distribute voter guides. Baker, an attorney with considerable campaign experience, sought legal advice from both the Office of White House Counsel and counsel for Bush–Quayle '92 as to whether he should take any further telephone calls from Robertson. Subsequently, Robertson left a telephone message at the White House to be forwarded to Baker, advising him that "[t]he Christian Coalition is distributing 1.3 million voter guides in North Carolina and 1.1 million guides in Georgia." FEC Ex. 0350–110.

On September 3, 1992, the Coalition sent candidate surveys to President Bush and Governor Clinton. The cover letter sought a response from the candidates by September 15. The letter warned "[s]hould you fail to respond, we will characterize your positions on the issues based on your public statements and policy record." FEC Ex. 034–0384. Bush–Quayle '92 sent a response on September 28, 1992. It appears the Clinton campaign did not reply. During a September Road to Victory training session, Reed explained that a survey was not sent to the Perot campaign even though Ross Perot was on the ballot in 35 states because Perot "is an asterisk in the national polls at this point." FEC Ex. 91 at 29. However, after discussion within the Coalition, a candidate survey was sent on October 2, 1992 to Ross Perot—who previously had withdrawn from, and then reentered, the campaign. The Perot campaign was given until October 5 to respond.

The Coalition had produced its first presidential voter guides by the September Road to Victory conference, prior to receiving President Bush's response to the candidate survey. At the September Road to Victory conference, the Coalition distributed a 16–page tabloid voter guide that included "candidate interviews" that were "simulated" by stringing together selected quotations from various sources and making them appear to be responses to questions posed by the Coalition. Endnotes identified the source of the quotes. The "interview" of President Bush included six quotations from Bush's "700 Club" interview with Robertson. FEC Ex. 002–2059.

The guide also featured a one-page hand-bill guide listing twelve issues, and columns with the photographs of candidates Clinton and Bush, under which appear either the word "supports" or "opposes." FEC Ex. 002–2060.[34]

The Coalition also used the one-page comparison in a bulletin insert voter guide. The Coalition produced 20,000 copies of the bulletin insert guide prior to the Road to Victory conference. In October, the Coalition produced a bulletin guide that included Perot and compared positions on the same twelve issues.

The Coalition produced and distributed nearly 40 million voter guides prior to the November 1992 election. The Coalition admits that it spent at least $241,915.43 printing and distributing the guides, not including overhead or staff costs. The Coalition also disbursed $23,000 to state affiliates for voter guide costs. The Coalition's financial records reflect disbursements of $562,802.05 for "Voter Guide Mailing." This amount may include some portion for voter guides produced for state elections.

The Coalition also made expenditures on a "get out the vote" campaign. By May 1992, the Coalition "house file" contained more than 229,000 names. To prepare for the 1992 elections, the Coalition engaged in a "voter identification" effort to compile a separate list of those who would be subject to GOTV calls. Reed assured the state affiliates that the voter list would be kept separate and that the voter list would not be used for fundraising. The Coalition's voter identification list contained more than one million names. Coalition records reflect a total expenditures of $1,203,446 and $63,814 for "voter identification" and "get out the vote" activities in 1992. The Coalition has not disaggregated this amount to reflect only that allocable to the 1992 presidential election.

## B. Congressional Coordinated Expenditures

The FEC makes similar allegations of illegal "coordinated expenditures" in connection with: (1) Senator Jesse Helms' 1990 reelection campaign; (2) the 1992 congressional campaign of Republican candidate, Robert D. Inglis; (3) the 1994 senatorial campaign by Republican candidate Oliver North; and (4) the 1994 congressional campaign of Representative John David ("J.D.") Hayworth. As with the 1992 presidential election, the FEC admits that none of these communications contained "express advocacy," but the Commission argues that these communications were produced in conjunction with the candidates and should be treated as prohibited in-kind corporate contributions.

### 1. 1990 Helms for Senate Campaign

Jesse Helms, a Republican, was first elected to represent North Carolina in the United States Senate in 1972, winning approximately 54 percent of the votes cast. He was reelected in 1978 with 55 percent of the vote, and in 1984 with approximately 52 percent of the vote. In the November 1990 general election, Senator Helms' Democratic challenger was the former mayor of Charlotte, North Carolina, Harvey B. Gantt.

The Coalition viewed Senator Helms as a staunch ally in Congress. *See, e.g.*, FEC Ex. 001–1667. In January 1990, Robertson sent Senator Helms a short letter on personal stationery indicating that "I would personally be delighted to be of any assistance that is needed when the campaign gets underway." FEC Ex. 043–0149. On May 30, 1990, Robertson received a letter from Helms discussing the possibility that Robertson would sign a

34. These were: (1) Balanced Budget Amendment; (2) Abortion on Demand; (3) Parental Choice in Education (Vouchers); (4) Voluntary School Prayer Amendment; (5) Homosexual Rights; (6) Raising Income Taxes; (7) Term Limits; (8) Death Penalty; (9) Increased Funding for SDI; (10) Line–Item Veto; (11) Tax–Funded Abortion; and (12) Condom Distribution in Schools. According to the guide, the candidates agreed on only two issues, supporting "death penalty" and "line-item veto."

fundraising letter drafted by the Helms for Senate campaign urging recipients to contribute to the Helms for Senate campaign and to contribute to the Coalition. On June 14, 1990, after having sought and received Reed's comment, Robertson authorized Helms for Senate to use his signature on the letter, which was mailed on or about July 30, 1990. Additional mailings went out in August 1990. Helms for Senate paid for these mailings.

At Reed's direction, the Coalition decided no later than September 1990 to expend corporate funds to produce a "voter guide" in North Carolina comparing the views of Senator Helms and Harvey Gantt on select issues, as characterized by the Coalition. The Coalition distributed voter guides for the 1990 general senatorial election in only six or seven states. The Coalition's point person for the North Carolina voter guide was Judith Haynes, Southeastern Regional Field Director. Haynes reported directly to Reed. In September 1990, Haynes sent questionnaires to both candidates at the same time and in the same manner. The questionnaire posed 20 questions in general terms asking the candidate to indicate whether he supports or opposes prospective legislative action on certain issues and providing three lines to explain the response. *See* FEC Ex. 001–0151. It appears as if the questionnaire was written independently by Coalition staff and that neither Senator Helms or his campaign staff suggested, nor had advance notice of, the issues included in the questionnaire.

Haynes was responsible for making follow-up telephone calls to secure a response from the candidates to the Coalition's questionnaire. On deposition, Haynes testified that she telephoned Gantt's campaign office on a number of occasions. On the day of the printing deadline, she was informed that Gantt would not be responding. Haynes contacted Senator Helms' staff "a couple of times" to find out if there would be a response. Reed also called senior staff at Helms for Senate. On October 11, 1990, a member of the Helms for Senate staff faxed the Senator's responses to Haynes.

Also on October 11, the Coalition sent a check for $5,775 to the North Carolina Christian Coalition for printing and distribution of the North Carolina voter guide. The only federal election covered by the guide was the Helms–Gantt senatorial election. In a single page, the guide, entitled "REPORT CARD On Moral and Traditional Family Issues" compared the responses of the candidates to 18 of the 20 issues contained in the questionnaire; Gantt's responses were listed as "Did Not Respond" and Helms' responses were either "Supports" or "Opposes." The Coalition began shipping the voter guides on October 23, 1990 for ultimate distribution at churches on Sunday, November 4, 1990. In a telephone call thanking Helms for responding to the questionnaire, Robertson advised Helms in advance of the November 4 distribution date. The Coalition, through its North Carolina affiliate, distributed at least 750,000 voter guides prior to the November 1990 election.

In October 1990, Reed may have been advised of the results of internal polls conducted by Helms for Senate showing Senator Helms trailing Gantt. Published polls around the same time also showed Senator Helms trailing Gantt.

The Coalition also provided its North Carolina affiliate with a $14,000 grant, made from general treasury funds, for a get-out-the-vote ("GOTV") telemarketing campaign. The Coalition identified those individuals to be called. The North Carolina Christian Coalition contracted with National Telemarketing Services, a Lynchburg, Virginia firm, to conduct the calls. North Carolina was the only state in which the Coalition provided funds for GOTV calls in 1990.

Senator Helms was reelected in 1990 with approximately 53 percent of the vote.

### 2. Inglis for Congress Committee

The Coalition spent an indeterminate amount to print and distribute approxi-

mately 200,000 voter guides shortly before the 1992 general congressional election in the Fourth District of South Carolina. The FEC alleges that this expenditure was an in-kind contribution to the Republican challenger, Robert D. Inglis, who defeated the Democratic incumbent, Elizabeth Patterson. The principal basis for the allegation is that the Coalition staff member closely involved in the voter guide production and distribution, Mr. Beverly Russell, also was centrally involved in the Inglis campaign.

Russell was the Fourth District Congressional District Coordinator for the South Carolina Christian Coalition in 1991 and 1992, chair of the Union County Christian Coalition chapter, and a member of the South Carolina Christian Coalition statewide Advisory Board. At that time, Russell also held positions in the Republican Party of South Carolina.

In 1991, Russell was invited to a strategy session among Republican Party members, convened by Inglis, to discuss possible candidates and strategies to oppose Patterson in the 1992 congressional election. Also present was Barry Wynn, chairman of the South Carolina Republican Party. After meeting with potential voters in early to mid–1991, Inglis filed a statement of candidacy on August 28, 1991. Russell was a volunteer member of the Inglis for Congress campaign

Among other activities, Russell arranged for and signed a contract for radio time on behalf of the Inglis campaign, and delivered the radio advertisement tape to the radio station in Union to be aired during the campaign. Russell arranged a meeting between Inglis and Republican precinct representatives in Union County. Russell attended a meeting of the 1992 Inglis campaign's paid and volunteer staff, at which Professor Woodard of Clemson University presented an analysis of precinct voting patterns "targeting precincts that would more likely go the Republican way" based on research conducted for the Inglis campaign. At that meeting, the In-

glis campaign's plans and strategies were discussed.

While Russell held positions with South Carolina Christian Coalition, he had knowledge or information regarding the plans and strategies of the Inglis campaign. Inglis' 1992 campaign focused on congressional reform, with particular emphasis on two issues: Inglis' self-imposed limit of three terms in the House of Representatives, and his decision not to accept any contributions from PACs. Russell knew that Inglis had made a strategic decision not to make abortion a prominent issue in his campaign, because Inglis' anti-abortion position would hurt him in the general election. Russell testified that "the main thing was, Bob Inglis would vote right, you know, on the issues. It is just that he was not going to shoot himself in the foot and get unelected by promoting it in the general election." FEC Ex. 71 at 139–142.

Prior to the 1992 election, Russell conducted a voter identification project in Union County, South Carolina for Christian Coalition with the intention of identifying voters sympathetic to Christian Coalition's issues.

By letter dated June 30, 1992, Guy Rodgers, Christian Coalition National Field Director, sent Inglis a seven-page "Christian Coalition 1992 Issues Survey: Federal Candidates," which Rodgers stated had been "mailed to every candidate for federal office in the United States." The 1992 survey was written by Rodgers and Reed over the course of a few months in early 1992. The survey was not written in coordination with the Inglis campaign. Inglis cannot recall personally completing the form, but a completed form was returned to the Coalition. Having read news accounts of the upcoming Coalition voter guides, Inglis called Russell to learn how his positions were presented in the voter guide. Russell read the issues and candidate positions to Inglis over the telephone, and Inglis confirmed that the guide accu-

rately stated his positions on the six issues chosen to be included in the Fourth District guide.[35] No evidence in the record indicates that Russell was involved in the selection of the six issues to be included in the Fourth District guide, each of which also was included in the guide for the 1992 senatorial election in South Carolina. *See* FEC Ex. 044–001456.

Russell distributed Christian Coalition's 1992 voter guides to churches in Union County. The voter guides were distributed at churches on the Sunday before election day. The South Carolina Christian Coalition also paid to put a copy of the voter guide in the *Greenville News,* a paper that circulated throughout most of the Fourth District. Russell distributed Christian Coalition's 1992 voter guide in newspaper delivery boxes the night before the election, and also distributed copies of campaign literature for Republican candidates that he had "on hand," including literature from the Inglis campaign.

### 3. North for Senate

In 1994, Oliver North campaigned to represent Virginia in the United States Senate. He faced opposition in a primary election, but won the Republican nomination in June 1994. North lost the general election in November 1994 to the Democratic incumbent, Senator Charles Robb. Pat Robertson and Ralph Reed, as well as other Coalition staff had close ties to the North campaign.[36] The Coalition was active in relation to the 1994 senatorial election in Virginia, conducting a get-out-the-vote campaign, distributing voter guides to churches, and sending postcard voter guides by mail. The FEC alleges that the Coalition spent $144,262.72 on these efforts—the actual amount spent is unclear—and that these expenditures were

illegal in-kind contributions to the North campaign.

Prior to the 1994 campaign, North had a number of ties to the Coalition. Robertson and North had traveled in similar circles since the 1980s. North addressed the Coalition's Road to Victory conference on many occasions, including in 1992 and 1993. According to North, he and Robertson share similar values and perspectives on the country. Reed first met North in May 1990, at a Coalition event in Arlington, Virginia. Prior to North's senatorial candidacy, his syndicated newspaper column was carried in the Coalition's newspaper, *Christian American.* In January 1994, Charles ("Chuck") Cunningham, a friend of North's from their mutual association with the National Rifle Association, became the Coalition's Voter Education Director.

In December 1992, Robertson attended a meeting in Williamsburg, Virginia to discuss North's political future. In March 1993, Reed joined an Advisory Board to assist North in his decision whether to run for Senate. Later in the Spring of 1993, North's opponent for the Republican nomination, James Miller, approached Reed and learned that Robertson and Reed intended to support North.

Other ties between the Coalition and the North campaign included David Hummel, who was both a member of the Virginia Christian Coalition's Board of Directors and the chairman of the North campaign in Virginia Beach, Virginia. With respect to at least one campaign-related letter from Hummel to North, Hummel indicated that a blind copy should go to Ralph Reed. North's political director, Thomas Bunnell, had a general sense that the Coalition was supporting North's campaign.

---

**35.** The guide lists the six issues as: (1) Raising Income Taxes; (2) Abortion on Demand; (3) Choice in Education (Vouchers); (4) Homosexual Rights; (5) Tax–Funded Obscene Art; (6) Balanced Budget Amendment. FEC Ex. 044–001456.

**36.** Among other ties, Robertson's daughter-in-law was the North campaign's Regional Field Director for Virginia Beach, Virginia area.

Demonstrating that support, shortly before the 1994 Republican state convention the Coalition shared a delegate list from the 1993 Republican Convention in Virginia with the North campaign. Of the more than 13,000 delegates that had attended the 1993 convention, 2,910 households had registered support for the Coalition's preferred candidate, Mike Farris, for Lieutenant Governor [hereafter "Farris list"]. By cross-checking, the Coalition had determined that 780 of the Farris supporters were in the Coalition's "house file," its database and mailing list. The Coalition did not make the Farris list publicly available. The Farris list would be valuable to a campaign because those on the list were highly likely to share the Coalition's views on a number of issues, including abortion, and many of the 1993 delegates would likely be delegates to the 1994 Virginia Republican convention.

Reed directed Coalition staff member, Joel Vaughan, to give a copy of the Farris list to the North campaign through an activist or volunteer. Vaughan cannot recall why, but it was his impression that it would have been improper to give the list directly to the campaign or to make explicit how the list might be used by the campaign. In February 1994, at the Virginia Republican party's meeting in Norfolk, Virginia, Vaughan looked in vain for a North volunteer or activist that he thought could be entrusted with the list.[37] Near the end of the day, Vaughan gave the list to Joe Elton, a paid consultant to the North campaign. Elton wanted to know what the list was. Vaughan's reply was vague, prompting Elton to again press for clarification, Vaughan may have explicitly mentioned the connection to Farris, and he recalls explaining to Elton that the Coalition thought Elton would be interested in the inch-thick list of "pro-life" people. *See* FEC Ex. 78 at 577–86.

Vaughan was unsure whether his giving the list to Elton had been legal. He sought guidance from Reed, who stated that by giving the list to a North campaign consultant, he had not actually given the list to the campaign.

Pat Robertson also signed a fundraising letter for the North campaign. The North campaign rented the Coalition's mailing list, and the Robertson letter was sent to those on that list. The North campaign paid $140 per 1,000 names on the Coalition's list. The letter requests that the recipient both contribute to the North campaign and volunteer to be a North delegate to the 1994 Virginia state Republican convention. Reply cards were coded to identify which list the respondent had been on. The Coalition rented its Virginia list to only one other federal candidate, the Republican candidate for the Fourth Congressional District of Virginia.

Delegate selection for the 1994 Virginia state Republican convention took place in the first quarter of 1994 through a series of mass meetings and conventions in the State's 134 political units. The North campaign treated its list of delegates as confidential. Thomas Bunnell, political director for the North campaign, and Cunningham, head of the Coalition's "voter education" effort, would call each other when they received information regarding the political unit mass meetings and would exchange information. The Coalition was active in informing its members about the time and place of the meetings. The North campaign, through Bunnell, actively sought out Coalition members to participate in the meetings. Bunnell shared information from the campaign's database concerning the time and place of delegate meetings as well as relevant North campaign contact people for each meeting. During the delegate selection period, Bunnell and Cunningham spoke once or twice a day.

---

**37.** Vaughan sought a person "who I could have told what the list was, without telling them specifically what to do with it. But who would have known what I, what a good thing to do with it would have been." FEC Ex. 78 at 582.

Cunningham drafted the text of mass mailings to go to those on the Coalition's mailing list, informing them of the time and place for delegate selection and urging their attendance. The Coalition made telephone calls from its internal phone bank to convey the same information. After delegates were selected, the Coalition contacted delegates that were Coalition supporters to determine whether they intended to support North or Miller at the state convention. Reed testified that the results of this poll were not shared with anyone.

The North campaign also conducted its own internal poll of all delegates. As the results were being tabulated, the poll was kept confidential by the campaign. The results were not made public until it became clear that North was the favorite to win the nomination. While Bunnell does not specifically recall sharing the results with Cunningham prior to public dissemination, he considered it likely that he did because he "was spinning various centers of influence in Virginia about how successful and how we were doing." FEC Ex. 6 at 96.

In July 1994, after North had won the Republican nomination to stand for Senate in the 1994 general election, Robertson hosted an informal meeting at his home in Hot Springs, Virginia to discuss negative media portrayal of Christian conservatives and to discuss means to encourage "Christian voters" to go to the polls in November. Invitations were prepared by Coalition staff. The meeting was held on a Thursday and Friday during working hours. Certain Coalition staff attended as part of their work duties. Also in attendance were members of the Republican Party of Virginia and a representative of the North campaign.

In advance of the November 1994 general election, the Coalition prepared voter guides in Virginia. Three candidates stood for election to the Senate: Senator Robb (Democrat), Oliver North (Republican), and Marshall Coleman (Independent). The Coalition produced six versions of its voter guide for Virginia. Each version contained the Senate guide on one page. The Senate guide provided responses, or partial responses, from each candidate. A separate version of the Senate guide was produced for distribution in Catholic churches. This version was designated as "Christian Coalition & League of Catholic Voters 1994 Voter Guide." See FEC Ex. 003–3133. In all, the Coalition produced approximately 1,750,000 voter guides in Virginia. Because the Coalition is headquartered in the state, Coalition staff had a more direct role in voter guide distribution than was the case in other states.

The record is unclear as to when candidate questionnaires for the Virginia guides were sent and how those questionnaires were drafted. It is undisputed that Cunningham made the initial selection of which issues were included in the Virginia guides, and it is likely that Reed approved his selection. See FEC Ex. 16 at 400 ("Ralph signed off on most of the different versions of voter guides that year, since it was my first year."). There is no evidence that Reed redesigned any of the Virginia guides.

In the North campaign's Chantilly, Virginia office, North's political director, Bunnell, sat in close proximity to the campaign manager, Timothy Carpenter. Carpenter would frequently update Bunnell on campaign-related news. From Carpenter's reports, Bunnell understood that Carpenter spoke with Reed in October 1994 about the Coalition's voter guides. Bunnell testified that the tenor of Carpenter's comments was that the Coalition's guides would be helpful to the North campaign. From Carpenter's comments, Bunnell inferred that Carpenter and Reed had discussed which issues should be placed on the Coalition's voter guides to aid the North campaign. See FEC Ex. 6 at 65. Bunnell also testified that he personally had discussions with people about what would be on the Coalition's Virginia voter guide in ad-

vance of its release. *See id.* at 121–22. However, Carpenter testified that he did not even know the Coalition would produce a guide until it was formally distributed, and that he was not contacted by the Coalition concerning where distribution of the guides would be most helpful to the North campaign. *See* CC Ex. 69 at 88–90.

Carpenter characterized the North campaign's informal reaction to the Coalition's Senate voter guide as follows:

> In some audiences it would be very good and in other audiences, who had strong feelings opposite of the Christian Coalition, it could be very damaging. So you hope that it went to the right group.

FEC Ex. 11 at 89.

It appears that the Coalition selected which churches received its voter guides. In addition, Cunningham decided to mail postcard voter guides in Virginia. These were mailed to the Coalition's "donor" list.

In 1994, the Coalition hired the same telemarketing company that the North campaign used to conduct GOTV calls for the general election in Virginia, Georgia, and Florida. A memorandum from the company indicates that the Coalition paid a total of $136,606.41 for these calls. The postcard voter guides cost $1,210.89, and the handbill voter guides cost $1,313.98.

#### 4. Hayworth for Congress

In 1994, John David ("J.D.") Hayworth campaigned as a Republican to represent the Sixth District of Arizona in the United States House of Representatives. Hayworth had been a television sports reporter and news anchor in Phoenix. Hayworth faced four opponents in the primary election, held on September 13, 1994, and Hayworth won. The general election was held on November 8, 1994, and Hayworth was elected with 55 percent of the vote. As with the Inglis campaign, the FEC's allegation is that a Coalition staff member who also was a volunteer in Hayworth's campaign, used inside information about the campaign's needs to guide the Coali-

tion's expenditures on voter guides. The FEC alleges that the Coalition spent $8,457, while the Coalition argues that the FEC can only prove expenditures of $2,449.91.

The FEC's allegation centers on the activities of Tom Grabinski. Grabinski met Hayworth in 1988 or 1989 through the Rotary Club in downtown Phoenix, Arizona. The two also met from time to time at events sponsored by Southern Baptist churches. For some time, Grabinski had urged Hayworth to run for Congress. In 1992, Grabinski became a Republican Party precinct committeeman. In early 1993, Hayworth invited Grabinski to a meeting to discuss fundraising for Hayworth's contemplated congressional campaign. In March 1993, Grabinski hosted a "meet and greet" gathering at his house for friends and associates to meet Hayworth. In October or November 1993, Grabinski was recruited to join the Hayworth campaign's finance committee.

In March 1994, Grabinski was recruited by then-Coalition Field Director, Guy Rodgers, to be the chairman of the Arizona Christian Coalition, which was formally incorporated in June 1994. Grabinski did not discuss his new role with the Coalition in much detail with Hayworth. However, Grabinski was instrumental in identifying other Southern Baptist churches in the state where Hayworth might worship when he was away from the Phoenix area on a Sunday.

Another connection between the Hayworth campaign and the Coalition was the friendship between Hayworth's campaign manager, Scott Hildebrand. Hildebrand had known Chuck Cunningham, the Coalition's Director of Voter Education, since 1982, when they worked together. During the 1994 campaign, Hildebrand and Cunningham would discuss the general tenor of the campaign and politics in general.

In the summer of 1994, the Coalition sent the Hayworth campaign a questionnaire for use in preparing a voter guide.

Fifty-two questions were asked. The Coalition's 1994 Primary Voter Guide listed ten issues and the responses of the five candidates. ·

For the general election, the Coalition prepared a handbill voter guide comparing the positions of Hayworth and the Democratic incumbent, Karen English, on six issues.[38] From Coalition documents, as of three weeks prior to the election, it appears the Coalition planned to send 200,-000 voter guides to the Sixth District and about 150,000 guides to other congressional districts in Arizona. Grabinski was largely responsible for identifying churches where the guides could be distributed and for recruiting individuals to distribute the guides to the churches. No record evidence demonstrates that Grabinski discussed his selection of distribution points or personnel with the Hayworth campaign. The actual number of guides distributed may have been somewhat more or less than planned.

The Coalition also reduced the guide to postcard size for mailing to individuals. This was an idea Cunningham brought to the Coalition from his experience with the National Rifle Association. As the Coalition's Director of Voter Education, Cunningham alone decided which elections would have both handbill voter guides and postcard guides. Cunningham testified that he selected which elections deserved postcard guides as follows:

> Well, a lot of it was a budgetary decision. We couldn't afford to do all the races because the postage is enormous. But it was where there was a high voter interest and it was important that religious conservatives participate. And we were educating them about the positions of the candidates on issues.

FEC Ex. 16 at 411–12. From Cunningham's review of Coalition documents, it appears that more than 12,000 postcard guides were sent to the Sixth District. *See* FEC Ex. 17 at 464–66. Hildebrand, Hayworth's campaign manager, testified that "Cunningham may have told me how many [voter] guides [the Coalition] would mail into the district, but no requests for information came from us and no advice ·issued from us." FEC Ex. 109 (Hildebrand Decl.) ¶ 16.[39]

In addition to sending two types of voter guides, the Coalition hired a telemarketing firm, also used by the Hayworth campaign, to conduct a GOTV campaign in the Sixth District. Cunningham wrote the script used for the GOTV campaign.

The Coalition also placed a paid "fieldman" in the Sixth District. A "fieldman's" function was "to help our local chapter chairman recruit church liaisons and expand the potential distribution of the voter guide." Cunningham testified that the decision of where to place a fieldman was based on similar considerations as those determining where postcard guides would be sent.

According to the FEC, the Coalition spent at least $8,374.41 on the primary and general election in Arizona's Sixth Congressional District.

## C. Coordinated Expenditures with the NRSC in 1990

The National Republican Senatorial Committee ("NRSC") was and is the national party committee dedicated to the election of Republican party candidates to the United States Senate. In 1990, the NRSC had a Director of Coalition Outreach, Curt Anderson, who was responsible for maintaining contact with non-party groups thought by the NRSC to have a

---

**38.** These were: (1) Raising Federal Income Taxes; (2) Balanced Budget Amendment; (3) Taxpayer Funding of Abortion; (4) Parental Choice in Education (Vouchers); (5) Homosexuals in the Military; and (6) Banning Ownership of Legal Firearms.

**39.** The Coalition raises another frivolous hearsay objection to the introduction of this testimony. Cunningham's statements are party admissions, admissible through Hildebrand's testimony.

"natural affinity" for its Republican senatorial candidates. NRSC's sole motive for getting involved with such groups was to elect Republican Senators; to energize the groups' members to vote at the 1990 general election. *See* FEC Ex. 72 (Shelby Dep.) at 43, 50. In this regard, in June 1990 the NRSC sought a meeting with Robertson and Reed "for the purpose of discussing coalition development in our key 1990 senate races." *See* FEC Ex. 043–0132.

On August 16, 1990, Robertson and Reed met with NRSC's Anderson and its political director, Richard Shelby. Shelby and Anderson briefed Reed and Robertson on the senatorial elections that NRSC considered "key," and asked whether the Coalition would be conducting voter education during the 1990 election cycle. Reed informed them that the Coalition aimed to distribute five to ten million voter guides in as many states as they could arrange for them to be distributed.

At the close of the meeting, Shelby suggested that NRSC make a contribution to the Coalition to support its voter guide project, underscoring that NRSC could neither direct the nature of the activities or the places at which they occurred. *See* FEC Ex. 57 (Reed Dep.) at 136. Robertson or Reed responded that the Coalition would accept such a contribution.

In a follow-up telephone conversation between Shelby, Anderson and Reed, Anderson explained that it could not make its contribution to the Coalition contingent on the voter guides being distributed in certain states or races. Reed responded "Absolutely" going on to say that the Coalition intended to distribute voter guides with or without the contribution and that guides would be distributed in states in which the NRSC was interested as well as those in which it was not.

The Coalition proceeded with its voter guide program. On September 14, 1992, the Coalition sent its Florida affiliate a check for $2,000 to cover the costs of voter guide printing and distribution. On Octo-

ber 2, 1990, the NRSC sent the Coalition a check for $50,000. It was the largest contribution the Coalition had received to date. On October 11, 1992, the Coalition sent checks to its affiliates in Florida ($10,000); Iowa/Nebraska ($7,200); North Carolina ($5,775); and Michigan ($1,000) to cover voter guide costs. On October 23, 1992, the Coalition sent a check for $3,600 to its Kentucky affiliate for voter guide costs. On October 24, NRSC sent the Coalition two more checks, for $10,000 and $4,000, respectively. Within the week, the Coalition made additional voter guide disbursements to affiliates in Michigan ($1,000) and Montana ($2,000), and $14,000 to the North Carolina affiliate for GOTV calls.

## VI. Discussion Of Corporate Coordinated Expenditures Under The FECA

Section 441 b(a) prohibits corporations and labor unions from making any "contribution or expenditure in connection with any [federal] election." Although the terms "contribution" and "expenditure" are separately defined in the FECA's general definition section, *see* 2 U.S.C. § 431(8), (9), the joint term "contribution or expenditure" also is defined in § 441b(b)(2). The *MCFL* Court interpreted these statutory definitions to have broad coverage but with respect to "expenditures in connection with" a federal election made by a corporation independent of any campaign, the First Amendment limits the Act's coverage to expenditures for "express advocacy." At issue between the parties is whether corporate expenditures "in connection with" a federal election that have been discussed with, coordinated with, or approved by a campaign are within the Act's coverage, and if they are, whether the First Amendment requires the Act be pared back to protect such expenditures.

### A. Preliminaries

#### 1. Statutory Interpretation

The parties recognize that this Court need only reach the constitutional issues if

it is first determined that the Coalition's above-described expenditures on voter guides and get-out-the-vote activities fall within the statutory prohibition of § 441b. The FEC interprets § 441 b to cover the Coalition's "coordinated expenditures" as prohibited "contributions" within the meaning of the Act.

In the normal administrative law case, the Court would be obliged to accept this as an accurate statement of the law so long as (1) Congress has not "directly spoken to the precise question at issue," and (2) the FEC's interpretation "is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Orloski v. Federal Election Comm'n*, 795 F.2d 156, 161–62 (D.C.Cir. 1986). Indeed, the Supreme Court has stated that the FEC is "precisely the type of agency to which deference should presumptively be afforded." *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981); *Common Cause v. Federal Election Comm'n*, 842 F.2d 436, 452 (D.C.Cir.1988). However, in a case such as this, the scope of *Chevron* deference is curtailed.[40]

The Act's overlapping definitions of contributions and expenditures in § 441b(b) and § 431(8),(9) create some surface ambi-guity concerning whether a disbursement must be to the candidate, directly or indirectly, or whether it must only be "in connection with" a federal election. *See MCFL*, 479 U.S. at 245–46 & n. 3, 107 S.Ct. 616. Acknowledging this ambiguity, the *MCFL* Court, using the ordinary tools of statutory construction, canvassed the legislative history and determined that Congress plainly intended the Act to reach corporate expenditures in connection with a federal election. *See id.* at 248, 107 S.Ct. 616. Under that construction, it is manifest that the Coalition's expenditures on voter guides fall within Congress's intended scope for § 441b. *See also* 2 U.S.C. § 441a(a)(7)(B) (treating coordinated expenditures as contributions for individuals, PACs and political parties). Even if the statute were ambiguous, triggering *Chevron* deference to the FEC's interpretation, the FEC also interprets the Act to reach this result.

## 2. Prior Interpretation Defense

The Coalition argues that even if § 441b can be plausibly construed to cover corporate coordinated expenditures on voter guides, the FEC has previously given the Act a narrower construction and cannot change its enforcement position without notice to the regulated community and an opportunity to be heard. Specifically, the Coalition argues that the FEC has only pursued corporate coordinated expendi-

---

**40.** The two leading rationales for *Chevron* deference are: (1) that the agency's superior technical expertise in the relevant field makes it better able to give the statute the effect intended by Congress; and (2) that because interpretation of ambiguous statutory terms always involves considerations of statutory policy, it is democracy-enhancing to have such policy choices be made by agencies, which are more accountable to the democratic majority than the unelected federal judiciary. *E.g., Michigan Citizens for an Independent Press v. Thornburgh*, 868 F.2d 1285, 1293 (D.C.Cir.), *aff'd by an equally divided Court*, 493 U.S. 38, 110 S.Ct. 398, 107 L.Ed.2d 277 (1989).

However, when ambiguous statutory terms are subject to an interpretation that would chill speech protected by the First Amend-ment, the foundation for *Chevron* deference is weakened. Article III of the Constitution establishes an unelected, life-tenured federal judiciary to provide the interpretive independence necessary to safeguard those precious liberties enshrined in the federal Constitution against encroachment by the elected branches acting at the behest of the popular majority at any given time. *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 57–60, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). For this reason, the FEC's interpretation of the FECA is presumptively entitled to *Chevron* deference so long as its statutory interpretation does not run afoul of the First Amendment, as interpreted by the federal courts. *See Chamber of Commerce v. Federal Election Comm'n*, 76 F.3d 1234, 1235 (D.C.Cir.1996).

tures for express advocacy. For this proposition, the Coalition relies extensively on *Orloski v. Federal Election Comm'n*, 795 F.2d 156 (D.C.Cir.1986).[41]

The FEC's position in *Orloski* is unrelated to the coordinated expenditures at issue in this case. *Orloski* involved a challenge to the FEC's limited use of an "express advocacy" standard, applicable "only to corporate funding of legislative events sponsored by a congressman," 795 F.2d at 165. Moreover, the Commission's "express advocacy" limitation was so narrow as to be arguably "at the outer bounds of permissible choice." *Id.* at 167.

The FEC has not ambushed the Coalition in this case. As is discussed more fully in a moment, *Buckley* established that "coordinated expenditures are treated as contributions rather than expenditures under the Act," 424 U.S. at 46, 96 S.Ct. 612, and the Court "has consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending." *MCFL*, 479 U.S. at 259–60, 107 S.Ct. 616 (citations

omitted). Contrary to the characterization of the Coalition and *amici*, the FEC hardly invented the "coordination theory" on its own.[42]

## B. Standard for Corporate "Expressive Coordinated Expenditures"

### 1. Constitutional Origin of "Coordinated Expenditures"

With one exception not directly at issue here, the FECA does not speak in terms of "coordinated expenditures." It contemplates that there will be campaign "contributions" and campaign-related "expenditures." Congress intended to place limits equally on both contributions and expenditures, as § 441b explicitly does. However, *Buckley* and its progeny have reaffirmed the profound constitutional difference between campaign contributions and *independent* expenditures.[43] *E.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 351 n. 14, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). *But see NCPAC*, 470 U.S. at 518–19, 105 S.Ct. 1459 (Marshall, J., dissenting)

**41.** In *Orloski*, an incumbent congressman who had been criticized as insensitive to the needs of senior citizens held a picnic shortly before the general election to meet with members of a senior citizen group. Three corporations collectively provided "in excess of one thousand hamburgers, an unknown quantity of potato salad and bus transportation." 795 F.2d at 165 (internal quotations omitted). At issue was whether these corporate donations were prohibited "contributions" to or "expenditures" related to the congressman's reelection campaign. Under the statute, these donations would qualify as contributions if made "for the purposes of influencing any election" or "in connection with any elections." *Id.* at 163.

With regard to public gatherings attended by an incumbent Member of Congress during campaign season, the FEC interpreted the Act to presume that the event was related to legislative rather than campaign activity unless *"someone* at the funded event expressly advocates the reelection of the incumbent or the defeat of an opponent or solicits or accepts money to support the incumbent's reelection." *Id.*

**42.** Indeed, the very authority on which the Coalition relies does not support its due process argument. For example, in *MCFL* the

FEC took the position that § 441b's limit on independent expenditures was not limited by the "express advocacy" standard. *See MCFL*, 479 U.S. at 249, 107 S.Ct. 616. Given § 441b's vintage, it is not surprising that "[i]n the context of corporate contributions or expenditures, the FEC historically was unwilling to limit its enforcement activities to express advocacy of the election or defeat of a particular candidate or candidates." *Maine Right to Life Comm., Inc. v. Federal Election Comm'n*, 914 F.Supp. 8, 9 (D.Me.), *aff'd mem.*, 98 F.3d 1 (1st Cir.1996). *See also Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n*, 518 U.S. 604, 617, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (plurality); *Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480, 498, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985); FEC Advisory Opinion 1988–22 [1976–1990 Transfer Binder] Fed. Elec. Camp. Fin. Guide (CCH) ¶ 5932 (1988).

**43.** Originally, the Act also did not speak of "independent expenditures" until Congress introduced that term in the wake of *Buckley*. *See* 2 U.S.C. § 431(17).

84

("Although I joined the portion of the *Buckley* per curiam that distinguished contributions from independent expenditures for First Amendment purposes, I now believe that the distinction has no constitutional significance.").

But the distinction was recognized to be problematic from the moment it was announced. The central premise of *Buckley*'s upholding dollar limits on campaign contributions was that these limits placed only a marginal burden on political speech:

A contribution serves as a general expression of support for the candidate and his views, *but does not communicate the underlying basis for the support* . . . . A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution *but does not in any way infringe the contributor's freedom to discuss candidates and issues.* While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate *involves speech by someone other than the contributor.*

*Id.* at 21, 96 S.Ct. 612 (emphasis added). By contrast, limits on expenditures

heavily burden core First Amendment expression. For the . . . right to speak one's mind on all public institutions includes the right to engage in vigorous advocacy no less than abstract discussion. Advocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation.

*Id.* at 47–48, 96 S.Ct. 612 (quotations, citations and footnote omitted).

In accord with this neat distinction between hardly-expressive-contributions and very-expressive-expenditures, the Court has allowed Congress and the FEC wide berth to promulgate "prophylactic" rules limiting contributions, so long as these rules are directly related to the Government's compelling interest in preventing the appearance of corruption flowing from large campaign contributions. By contrast, the Court has progressively struck down or severely curtailed the Act's limitations on independent expenditures as failing to show a close enough nexus to the Government's compelling interest. *E.g., Colorado Republican,* 518 U.S. at 618, 116 S.Ct. 2309 (Breyer, J., for the plurality) (striking limits on political party independent expenditures); *id.* at 631, 116 S.Ct. 2309 (Kennedy, J., concurring in the judgment) (same); *MCFL,* 479 U.S. at 249, 107 S.Ct. 616 (limiting corporate independent expenditure provision to "express advocacy"); *NCPAC,* 470 U.S. at 500–01, 105 S.Ct. 1459 (striking limits on PAC independent expenditures); *Buckley,* 424 U.S. at 47–48, 96 S.Ct. 612 (striking limits on independent expenditures by individuals).

While on the facts of many of these cases, the Supreme Court has been able to maintain a clean doctrinal division between contributions and expenditures, a separate analytical step by *Buckley* made clear that the distinction could be easily blurred. Responding to those opposing the contribution/expenditure distinction, the *Buckley,* Court reassured:

The parties defending [the cap on expenditures by individuals] contend that [the cap] is necessary to prevent would-be contributors from avoiding the contribution limitations by the simple expedient of paying directly for media advertisements or for other portions of the candidate's campaign activities . . . . *Yet such controlled or coordinated expenditures are treated as contributions rather than expenditures under the Act. Section 608(b)'s contribution ceilings rather than § 608(e)(1)'s independent expenditure limitation prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions.* By contrast,

§ 608(e)(1) limits expenditures for express advocacy of candidates made totally independently of the candidate and his campaign.

*Id.* at 46–47, 96 S.Ct. 612 (footnote omitted) (emphasis added). Thus, *Buckley* introduced the notion of "coordinated expenditures" and held that for constitutional purposes such expenditures had the status of contributions. *See Colorado Republican*, 518 U.S. at 617, 116 S.Ct. 2309 (plurality) ("the constitutionally significant fact . . . is the lack of coordination between the candidate and the source of the expenditure.").[44]

Having previously narrowly defined the First Amendment interest at stake with contribution limits, *Buckley*, in its treat-ment of coordinated expenditures as in-kind contributions, left undiscussed the First Amendment concerns that arise with respect to "expressive coordinated expenditures."[45] An example of such an expenditure would be for a television advertise-ment favorably profiling a candidate's stand on certain issues which is paid for and written by the *contributor*, in which the advertisement does "express the underlying basis for his support," and *does* discuss candidates and issues, but for which the expenditure is done in coordination with, or with the authorization of, the candidate. It can only be surmised that the *Buckley* majority purposely left this issue for another case.[46] In many respects this is that case.[47]

44. Most respectfully, a more straightforward understanding of *Buckley*'s treatment of coordinated expenditures is that the First Amendment required most *independent* election-related expenditures to be carved out from the FECA's broad coverage, leaving only expenditures for "express advocacy" by corporations and unions within the Act's scope. Yet that constitutional carve-out left the Act's expenditure limitations intact with respect to coordinated expenditures. Thus consistent with congressional intent, the Act's "expenditure" limits rather than "contribution" limits would apply to coordinated expenditures. However, tracking the quoted portion of *Buckley*, Congress enacted 2 U.S.C. § 441 a(a)(7)(b), which treats coordinated expenditures as contributions.

45. This Court is loathe to add to the already arcane vocabulary of federal campaign finance regulation. However, as will be seen, the First Amendment requires different treatment for "expressive," "communicative," or "speech-laden" coordinated expenditures, which feature the speech of the spender, from coordinated expenditures on non-communicative materials, such as hamburgers or travel expenses for campaign staff.

As used in this Opinion, an "expressive coordinated expenditure" is one for a communication made for the purpose of influencing a federal election in which the spender is responsible for a substantial portion of the speech and for which the spender's choice of speech has been arrived at after coordination with the campaign. A mere expenditure to increase the volume of the candidate's speech by funding additional purchases of campaign materials—posters, buttons, leaflets, etc,—does not raise the same type of First Amendment concerns that are at issue here. *Cf.* 2 U.S.C. § 441a(a)(7)(B)(ii) (treating as a contribution "the financing by any person of the dissemination, distribution, or republication, in whole or in part, of any broadcast or any written, graphic, or other form of campaign materials *prepared by the candidate* . . . . ") (emphasis added) (This subsection does not require coordination and would appear on its face to prohibit an individual from independently adopting the candidate's speech as his own.).

46. Two Justices in dissent attacked the contribution/expenditure distinction on precisely these grounds but drew no response from the majority. *See Buckley*, 424 U.S. at 243, 96 S.Ct. 612 (C.J. Burger, concurring in part and dissenting in part) ("Whether the speech is considered an impermissible 'contribution' or an allowable 'expenditure' turns, not on whether speech by 'someone other than the contributor' is involved, but on whether the speech is 'authorized' or not."); *id.* at 252, 261, 96 S.Ct. 612 (White, J., concurring in part and dissenting in part) (decrying differing results under the Act if two brothers place identical television spots favoring a candidate—one with coordination, and the other without—concluding that "[t]he Act as cut back by the Court thus places intolerable pressure on the distinction between "authorized" and "unauthorized" expenditures on behalf of a candidate.").

47. The precise case left open by *Buckley* would involve an expressive coordinated expenditure by an individual. Such facts were

## 2. "Coordination"

Because the Act by its terms applies to the Coalition's expenditures on voter guides, the question presented is whether the First Amendment requires a limiting construction of the Act that would protect the Coalition's expenditures in this case. More specifically, under the First Amendment, are a corporation's expenditures on voter guides and get-out-the-vote telephone calls "independent" of a campaign or "coordinated with" the campaign where the evidence shows, among other things, that the corporation was privy to non-public information about a campaign's strategies and discussed the corporation's plans to make campaign-related expenditures in advance with the campaign? [48]

If the contacts at issue in this case are constitutionally insignificant, the expenditures remain "independent," and only violate § 441b if the voter guides, voter identification calls, and get-out-the-vote calls constitute "express advocacy," which the FEC concedes they do not. Nonetheless, if on these facts the Coalition's expenditures were "coordinated," and were therefore "contributions" for constitutional purposes, are they automatically prohibited by § 441b or does the First Amendment require a limiting construction of statutory "contributions" with respect to expressive coordinated expenditures?

Regrettably, neither the parties nor *amici* appear willing to confront the real difficulties posed by this case. On the one hand, the Coalition and *amici* argue that because a corporation or union's own speech is involved in expressive coordinated expenditures, § 441b's limitation can only apply to "express advocacy" no matter how thoroughgoing the coordination of the speech may be. On the other hand, the FEC argues that *Buckley* already conducted the interest balancing with respect to coordinated expenditures—including expressive coordinated expenditures—and decided these were contributions subject to dollar limitations for individuals, PACs, and political parties, and subject to a total prohibition for corporations and labor unions. Alternatively, the FEC argues that even if *Buckley* left the issue open, the Supreme Court's authorization of prophylactic rules on contributions extends to prophylactic prohibitions on expressive coordinated expenditures.[49]

## 3. Expressive Coordinated Expenditures Are Not Limited To "Express Advocacy"

■ The Coalition and *amici* advance the argument that the "express advocacy"

presented in *United States v. Goland,* in which the Ninth Circuit upheld the criminal FECA conviction of a contributor who scripted and funded a television advertisement for a third-party candidate in coordination with the candidate, 959 F.2d 1449, 1452 (9th Cir.1992). This was done even though the defendant's ultimate goal in scripting and funding the spot was to use the third-party candidate's statements to throw support to one of the major-party candidates. But, the *Goland* court was not presented with a direct First Amendment challenge to the government's theory that expressive coordinated expenditures, such as television spots scripted by the contributor, are contributions subject to FECA's limitations and therefore it did not discuss the issue in those terms.

**48.** *Cf. Clifton v. Federal Election Comm'n,* 114 F.3d 1309, 1326 (1st Cir.1997) (Bownes, J., dissenting) ("[T]he question here is whether

the degree of coordination between MRTLC and the candidates in preparing the voter guides is sufficient to treat the money spent to produce and distribute the guides as a contribution and therefore regulable, taking into account constitutional requirements.").

**49.** *See Colorado Republican,* 518 U.S. at 627, 116 S.Ct. 2309 ("The central holding in *Buckley* ... is that spending money on one's own speech must be permitted. . . . ").

Subsequent to the events in this case, the FEC codified its views on coordination between campaigns and those who prepare voter guides. *See* 11 C.F.R. § 114.4(c)(4), (5). Over a vigorous dissent, the First Circuit rejected the FEC's argument that its rule, which, among other things, requires those preparing voter guides to communicate with candidates about the guides only in writing, was justified as a necessary prophylactic. *See Clifton,* 114 F.3d at 1317.

limitation must apply to expressive coordinated expenditures on both quasi-statutory and constitutional grounds. The quasi-statutory argument is that under Supreme Court precedent, the term "expenditure" has been limited throughout the Act to express advocacy. This position is untenable.[50] Indeed, in direct contrast to the Coalition's position in this case, *Orloski* held that the "express advocacy" standard was not constitutionally required for statutory provisions limiting contributions. *Orloski*, 795 F.2d at 167.[51]

In the alternative, the Coalition and amici argue that even if the question remains open, the First Amendment requires that § 441b's contribution prohibition on expressive coordinated expenditures also be limited to "express advocacy." This argument is unpersuasive.

It may be—if the Ninth Circuit's Goland opinion is fully consistent with the First Amendment—that this is an *a fortiori* case. For, if an *individual* can be criminally charged and convicted for making an

**50.** *Buckley* read an express advocacy standard into the statutory provisions regarding independent expenditures "relative to" a clearly identified candidate, 424 U.S. at 46–47, 96 S.Ct. 612, and independent expenditures "for the purpose of influencing any election for Federal office," *id.* at 79–80, 96 S.Ct. 612; *see also CAN II*, 110 F.3d at 1051. The express advocacy standard was coined to cure the vagueness inherent in those two phrases—"relative to" and "for the purpose of ... influencing"—but for ease of reference the Court adopted a shorthand by which the express advocacy standard applied to certain "expenditures." *See id.* at 80, 96 S.Ct. 612 ( "[W]e construe "expenditure" for *purposes of that section* [§ 434] in the same way we construed the terms of § 608(e) to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate.") (emphasis added) (footnote omitted).

The Coalition advances a fanciful interpretation of *Buckley*. In the context of discussing FECA's disclosure obligations, the *Buckley* Court reaffirmed that the term "contribution" includes "all expenditures placed in cooperation with or with the consent of a candidate, his agents, or an authorized committee of the candidate." *Buckley*, 424 U.S. at 78, 96 S.Ct. 612. Because, as the *Buckley* Court had explained earlier in its Opinion, such coordinated expenditures involve a limited amount of speech by the contributor, the Court found that the First Amendment did not require a narrowing understanding of "expenditure" as used in the above-quoted sentence. The Court used the term "expenditure" in the phrase "expenditures placed in cooperation with or with the consent of a candidate" advisedly, leaving intact, the normal, broad meaning Congress had given it. However, with respect to the statutory term "expenditure," which the *Buckley* Court interpreted to mean "independent expenditure," the doctrine of unconstitutional vagueness required that Congress's broad definition be narrowed

to expenditures on communications containing express advocacy. The reason, again, was because restrictions on independent expenditures directly burdened substantial amounts of core political speech. *See id.* at 79–80, 96 S.Ct. 612. Consequently, with regard to "coordinated expenditures" there is no constitutional need to narrow the definition of the term "expenditure" given by Congress.

In *MCFL*, the Court again focused on vagueness problems in the statute's language connecting independent corporate or union expenditures to federal elections: either "in connection with" or "for the purpose of influencing." *See MCFL*, 479 U.S. at 245–48 & n. 3, 107 S.Ct. 616; *see also Federal Election Comm'n v. National Organization for Women*, 713 F.Supp. 428, 433 (D.D.C.1989). Adopting Buckley's shorthand, the *MCFL* Court announced: "We therefore hold that an expenditure must constitute 'express advocacy' in order to be subject to the prohibition of § 441b." *MCFL*, 479 U.S. at 249, 107 S.Ct. 616.

This shorthand reference to "expenditures" for which an "express advocacy" requirement exists is limited to those statutory phrases for which the First Amendment required a narrowing construction and does not generally limit the term "expenditure" as used throughout the FECA. *See Colorado Republican*, 518 U.S. at 614–15, 116 S.Ct. 2309 (plurality) (referring to "the Court's precedents that extend First Amendment protection to *independent* expenditures") (emphasis added); *cf. Orloski*, 795 F.2d at 167.

**51.** The Coalition dismisses *Orloski*'s holding on this point as "*dicta*," arguing that it was superseded by *MCFL*, but *MCFL* construed the Act only with regard to independent expenditures, leaving in place *Buckley*'s treatment of coordinated expenditures as contributions. *See MCFL*, 479 U.S. at 249, 259–60, 107 S.Ct. 616.

illegal in-kind contribution by (1) scripting and producing a candidate's campaign-related television appearance in concert with the candidate, *Goland*, 959 F.2d at 1452, (2) expending a sum considerably in excess of the limit on campaign contributions on the television appearance, *id.* at 1451, (3) without the television appearance expressly advocating the election or defeat of a clearly identified candidate, *id.* at 1455 (Pregerson, J., dissenting), then surely a *corporation* that writes a communication "for the purpose of influencing a federal election" in concert with a candidate's campaign can be held civilly liable for making an illegal in-kind contribution even when that communication does not contain "express advocacy."

However, even if *Goland* does not provide a sound basis for rejecting the Coalition's argument, it must also be rejected because importing the "express advocacy" standard into § 441b's contribution prohibition would misread *Buckley* and collapse the distinction between contributions and independent expenditures in such a way as to give short shrift to the government's compelling interest in preventing real and perceived corruption that can flow from large campaign contributions. Were this standard adopted, it would open the door to unrestricted corporate or union underwriting of numerous campaign-related communications that do not expressly advocate a candidate's election or defeat. *Cf.* 2 U.S.C. § 441a(a)(7)(B)(ii).

For example, expensive, gauzy candidate profiles prepared for television broadcast or use at a national political convention, which may then be broadcast, would be paid for from corporate or union treasury funds. Such payment would be every bit as beneficial to the candidate as a cash contribution of equal magnitude and would equally raise the potential for corruption. *Cf. Buckley*, 424 U.S. at 36–37, 96 S.Ct.

612. Even more pernicious would be the opportunity to launch coordinated attack advertisements, through which a candidate could spread a negative message about her opponent, at corporate or union expense, without being held accountable for negative campaigning. Coordinated expenditures for such communications would be substantially more valuable than dollar-equivalent contributions because they come with an "anonymity premium" of great value to a candidate running a positive campaign. Allowing such coordinated expenditures would frustrate both the anti-corruption and disclosure goals of the Act. The First Amendment requires that the statute be construed to permit only narrowly tailored restrictions on speech that advance the Government's anti-corruption interest, but the Coalition's position allows for no restrictions at all on such expenditures.

Finally, the proposed benefit of this allegedly "bright-line" standard—greater First Amendment clarity—is largely illusory. The Coalition and *amici* argue strenuously that the legal standard for "coordinated expenditures" must be sufficiently clear to minimize the FEC's intrusive investigations into communications between corporations or labor unions and candidates.[52] But their proposed standard only minimizes the pool of matters that may be investigated by requiring as a predicate that the questioned activity involve "express advocacy." Even within that pool, the real issue, as both Chief Justice Burger and Justice White recognized, is whether an expenditure is "authorized" by a campaign or "coordinated" with the campaign, a necessarily fact-intensive inquiry allowing for extensive FEC inquiry into the nature and extent of communications between the alleged contributor and campaign. This Court fully agrees that the standard for coordination must be restrictive, limiting the universe of cases trigger-

---

52. While the Coalition bitterly complains about the extent of discovery in this case, it should be noted that the Coalition did not file a motion under FED. R. CIV. P. 12(b)(6), as it could have done, to test the legal sufficiency of the FEC's coordination theory in advance of discovery.

ing potential enforcement actions to those situations in which the coordination is extensive enough to make the potential for corruption through legislative *quid pro quo* palpable without chilling protected contact between candidates and corporations and unions. But some room for fact-intensive inquiry is inevitable.

As a final alternative, the Coalition suggests that the test for coordination of expressive expenditures should be whether the corporation or union would have made the expenditure but for the intercession of the candidate or his staff. While closer to the mark, this standard also defines "coordination" too narrowly, leaving unregulated expressive expenditures proposed by

the corporation or union and negotiated with the campaign.

## 4. An "Insider Trading" or Conspiracy Standard is Overbroad

At the other end of the spectrum is the FEC, which argues that any consultation between a potential spender and a federal candidate's campaign organization about the candidate's plans, projects, or needs renders any subsequent expenditures made for the purpose of influencing the election "coordinated," i.e., contributions.[53] The FEC borrows from two statutory provisions and one of its regulations for support of this standard.[54] While these provi-

**53.** The Coalition and *amici* characterize this standard as posing a "Hobson's choice of constitutional dimension" between either lobbying the campaign on issues but spending no money on the election (for fear that the FEC will deem such expenditures "coordinated") or remaining walled off from the campaign so that all campaign-related expenditures are clearly independent. The FEC rejoins that its standard is no different than a drunk driving law, which permits an adult to drink or to drive but prohibits the dangerous mixture of the two activities. It is the Commission's view that contact between a potential spender and a campaign about the candidate's strategy along with discussion of the candidate's stand on issues is a similarly dangerous combination, making the opportunities for corrupt bargains palpable.

**54.** The FEC comes to its understanding of a "coordinated expenditure" by relying on § 441 a(a)(7)(b), which provides that for purposes of subsection (a) [which does not apply to the Coalition]:

(i) expenditures made by any person in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate.

2 U.S.C. § 441a(a)(7)(B)(i).

The FEC also considers a "coordinated expenditure" to be the partial converse of a § 431(17) "independent expenditure," which is

an expenditure by a person expressly advocating the election or defeat of a clearly identified candidate which is made without cooperation or consultation with any candidate ... and which is not made in concert

with, or at the request or suggestion of, any candidate....

2 U.S.C. § 431(17). Section 431(17) defines "independent expenditures" that must be reported under § 434(c). Because a corporation, such as the Coalition, may not make independent expenditures, corporations, unions and national banks are not "persons" within the meaning of § 431(17).

By regulation, the FEC has elaborated that under § 431(17):

*Made with the cooperation or with the prior consent of, or in consultation with, or at the request or suggestion of, a candidate or any agent or authorized committee of the candidate—*

(i) Means any arrangement, coordination, or direction by the candidate or his or her agent prior to the publication, distribution, display, or broadcast of the communication. *An expenditure will be presumed to be so made when it is—*

(A) Based on information about the candidate's plans, projects, or needs provided to the expending person by the candidate, or by the candidate's agents, with a view toward having an expenditure made; or

(B) Made by or through any person who is, or has been, authorized to raise or expend funds, who is, or has been, an officer of an authorized committee, or who is, or has been, receiving any form of compensation or reimbursement from the candidate, the candidate's committee or agent.

11 C.F.R. § 109.1(b)(4).

An expenditure not qualifying under this section as an independent expenditure shall be a contribution in-kind to the candidate and an expenditure by the candidate, unless otherwise exempted.

*Id.* § 109.1(c).

sions are a logical starting point, it must be remembered that because "coordination" marks the constitutional dividing line between corporate contributions subject to prohibition and protected issue-oriented expenditures, that line ultimately is drawn by reference to the First Amendment, not the Act.

For that reason, the FEC's "insider trading" or conspiracy approach to coordination is overbroad, at least with respect to expressive coordinated expenditures. To be sure, the scenario the FEC paints to support its approach is plausible: A corporate or union representative meets with campaign staff on one or more occasions and receives non-public information about the campaign's strategy; the corporate or union representative learns that the campaign seeks to highlight one or more of the candidate's policy positions before a specific constituency; acting on the "tip," the corporation or union expends or "invests" considerable sums from its "war chest" to pay for communications highlighting said policy position(s) before said constituency; after the candidate is elected, the corporation or union seeks to profit from its investment by demanding special access to the elected official or a legislative *quid pro quo.*

Added to this, is the Supreme Court's determination that the corporate form, which allows and promotes the massive aggregation of wealth, is a special State-conferred benefit which may, in some instances, lead to differential treatment under the First Amendment to account for special corporate features. *See, e.g,. NCPAC,* 470 U.S. at 495, 105 S.Ct. 1459.

Nonetheless, while this plausible scenario demonstrates that the potential for corruption flowing from coordinated expenditures is non-speculative, the prohibition on such expenditures must be narrowly tailored to meet this danger. An "insider trading" or conspiracy approach also sweeps in all attempts by corporations and unions to discuss policy matters with the candidate while these groups are contemporaneously funding communications directed at the same policy matters. *Cf. Clifton,* 114 F.3d at 1313 (FEC's bar on oral contact regarding voter guides is an overbroad prophylactic rule). The FEC believes that its concept of coordination is narrowly tailored to the anti-corruption interest because its definition "reaches only those expenditures that are made after consultation with a candidate concerning campaign strategy or activities, not mere lobbying or asking a candidate or incumbent where she stands on a particular policy issue or proposed legislation." FEC Reply Mem. at 9.

But as the facts of this case demonstrate, discussion of campaign strategy and discussion of policy issues are hardly two easily distinguished subjects. *See Buckley,* 424 U.S. at 249, 96 S.Ct. 612 ("Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions."). The FEC's tidy distinction between discussion of campaign strategy and mere lobbying is cold comfort for those who seek to discuss with a candidate an issue that is at the time dominating the campaign. Indeed, the record in this case demonstrates that a candidate's decision when to take a stand, where to stand, and how to communicate the stand on a policy issue often are integral parts of campaign strategy. The facts further demonstrate that a candidate frequently listens to the concerns of sympathetic constituencies or factions before making those important strategic decisions. While the FEC's approach would certainly address the potential for corruption in the above-described scenario, it would do so only by heavily burdening the common, probably necessary, communications between candidates and constituencies during an election campaign.

At oral argument in this case, the Court pressed both parties to provide their proposed legal standard for defining the activities that would amount to "coordination" of expenditures. Perhaps for institutional reasons, neither party was particularly re-

sponsive. For its part, the FEC considered this an easy case, arguing that even if it is difficult to say precisely where coordination starts and ends, on the facts of this case, this is coordination.[55] This Court cannot so readily agree.

Not only does the FEC's approach heavily burden communication leading up to the expenditure, but it also neglects the fact that expressive coordinated expenditures contain the political speech of the spender; more than the "speech by proxy" involved in a cash contribution. *See Colorado Republican,* 518 U.S. at 638–39, 116 S.Ct. 2309 (Thomas, J., dissenting). This Court is bound by both the result and the reasoning of *Buckley,* even when they point in different directions. While *Buckley* confidently assured that coordinated expenditures fell within the Act's limits on contributions, it also reasoned that spending money on one's own political speech is an act entitled to constitutional protection of the highest order. Expressive coordinated expenditures bear certain hallmarks of a cash contribution but also contain the highly-valued political speech of the spender. *See Colorado Republican,* 518 U.S. at 624, 116 S.Ct. 2309 (plurality); *Clifton,* 114 F.3d at 1325 (Bownes, J., dissenting) (coordinated expenditure on voter guide "occupies a middle ground"). I take from *Buckley* and its progeny the directive to tread carefully, acknowledging that considerable coordination will convert an expressive expenditure into a contribution but that the spender should not be deemed to forfeit First Amendment protections for her own speech merely by having engaged in some consultations or coordination with a federal candidate.

### 5. "Coordination" Defined

█ First Amendment clarity demands a definition of "coordination" that provides the clearest possible guidance to candidates and constituents, while balancing the Government's compelling interest in preventing corruption of the electoral process with fundamental First Amendment rights to engage in political speech and political association. This Court will only address coordination as it applies to expressive coordinated expenditures by corporations. The interest-balancing process may well yield different results for non-expressive coordinated expenditures or for expressive coordinated expenditures by individuals.

*Buckley* drew from the FECA's legislative history the concept of "coordinated expenditures" in response to those who feared that the Act's constitutionally permissible contribution limitations could be easily circumvented through coordinated expenditures. A narrowly tailored definition of expressive coordinated expenditures must focus on those expenditures that are of the type that would be made to circumvent the contribution limitations.

A contribution provides the candidate with something of value that she wants or needs. Fungible contributions, cash, provide the candidate with the most flexibility. The government's compelling interest arises from the recognition that as the magnitude of a contribution grows, so grows the likelihood that the candidate will feel beholden to the source of those contributors. And, once elected, the candidate may feel obliged to take official action that is not in the public interest to meet the demands of the contributor.

An expressive coordinated expenditure is not fungible and its value to the candidate depends on the circumstances. That portion of the FEC's approach which would treat as contributions expressive coordinated expenditures made at the request or the suggestion of the candidate or an authorized agent is narrowly tailored.

---

55. *See Clifton,* 114 F.3d at 1311 (noting that FEC's voting guide regulation does not define "coordination"); *cf. Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring) (explaining that when it comes to hard core pornography lying outside the protection of the First Amendment, "I know it when I see it").

92

The fact that the candidate has requested or suggested that a spender engage in certain speech indicates that the speech is valuable to the candidate, giving such expenditures sufficient contribution-like qualities to fall within the Act's prohibition on contributions.

In the absence of a request or suggestion from the campaign, an expressive expenditure becomes "coordinated;" where the candidate or her agents can exercise control over, or where there has been substantial discussion or negotiation between the campaign and the spender over, a communication's: (1) contents; (2) timing; (3) location, mode, or intended audience (e.g., choice between newspaper or radio advertisement); or (4) "volume" (e.g., number of copies of printed materials or frequency of media spots). Substantial discussion or negotiation is such that the candidate and spender emerge as partners or joint venturers in the expressive expenditure, but the candidate and spender need not be equal partners. This standard limits § 441b's contribution prohibition on expressive coordinated expenditures to those in which the candidate has taken a sufficient interest to demonstrate that the expenditure is perceived as valuable for meeting the campaign's needs or wants.

Admittedly, a standard that requires "substantial" anything leaves room for factual dispute. The possibility that the FEC may deem a corporation or union's pre-expenditure discussions or negotiations with a campaign to be "substantial" will chill some speech. But expressive coordinated expenditures present real dangers to the integrity of the electoral process. This standard balances those considerations. As my former colleague on this Court, Judge Michael Boudin, recently wrote:

> [W]e readily accept that the government has an interest in unearthing disguised contributions. But the FEC is free to investigate any instance in which it thinks that inquiry has become collaboration; nothing, apart from conclusory allegations, has been offered by the

FEC to suggest that ordinary enforcement measures cannot adequately police "secret" corporate contributions.

*Clifton,* 114 F.3d at 1315.

## C. Applying the Standard

■ The FEC argues that the frequent contacts between high-level Coalition officials and the campaign staffs of various federal candidates in advance of the Coalition's expenditures on voter guides and get-out-the-vote telephone solicitations was sufficient coordination to treat those expenditures as campaign contributions. Because the focus for each campaign is on those two types of expressive coordinated expenditures, the Court will apply the standard to those types of communications in general and then briefly discuss any campaign-specific variations.

### 1. Voter Guides

Voter guides can involve varying degrees of expression. At issue here, with the exception of the Coalition's 1992 tabloid voter guide, are single-page guides that identify an issue with a single phrase and represent the candidate's position with one of three options: "supports," "opposes," or "did not respond." To illustrate, Appendix A to this Opinion is the single-page October version of the Coalition's 1992 presidential election guide. To produce these guides, the Coalition drafted a candidate questionnaire that sought a response to questions asking whether the candidate supports or opposes a wider range of issues than is presented on the voter guide.

Under the standard for coordination articulated herein, discussion or negotiation over the contents of the guide includes discussion of how an issue is phrased on the guide—for example "homosexual rights" versus "human rights"—and which issues are, or are not, to be included in the guide. *Cf.* 11 C.F.R. § 114.4(c)(4). Similarly discussion of which issues are included in the candidate survey, or the phrasing

of the questions thereon, also would be coordination.

More difficult is determining when discussions with a campaign regarding whether the candidate "supports" or "opposes" an issue become coordination. *Cf. Clifton*, 114 F.3d at 1316 (interpreting FEC's position on coordination to include conversation with incumbent's campaign on how to interpret candidate's apparently conflicting votes). Such conversations lie in the heartland of protected political discussion but also involve considerable incentives to engage in corrupt practices. To become coordination, the conversation between a corporation preparing a voter guide and the candidate must go well beyond inquiry into negotiation. For example, if the corporation's interpretation of the candidate's prior statements or votes would lead it to say he "opposes" the issue, and the campaign tries to persuade the corporation to use "supports" on the guide, that is coordination. Realistically, it may well be difficult for the FEC to prove the existence of such negotiation—which is why it argues that it needs a prophylactic rule—but any less restrictive interpretation of coordination would impermissibly chill protected expression.

Turning to the remaining forms of coordination, discussions of the timing, location of distribution, or volume of voter guide distribution also must transgress mere inquiry. A corporation's mere announcement to the campaign that it plans to distribute thousands of voter guides in select churches on the Sunday before election day, even if that information is not yet public, is not enough to be coordination. Coordination requires some to-and-fro between corporation and campaign on these subjects.

## 2. "Get–Out–The–Vote"

Similarly, coordination of expenditures on get-out-the-vote telephone exhortations must rise to the level of discussion or negotiation over (1) the contents of the script; (2) when the calls are to be made; (3) the "location" or audience, including discussion of which databases are to be used; or (4) the number of people to be called.

## 3. The Campaigns

From these principles of application, it appears that the Coalition avoided impermissible coordination of its voter guide and GOTV expenditures, although not for lack of trying. The primary reason that these expenditures were not coordinated is that campaign staff, armed with foreknowledge of the Coalition's plans, chose not to respond to the Coalition's implicit offers to discuss or negotiate those plans.

### a. 1992 Presidential Election

The facts regarding coordination are the most extensive in relation to Bush–Quayle '92. The predicate for the FEC's theory of liability is that the Coalition, through Reed and Robertson, had special access to the Bush campaign's strategy. In fact, Reed frequently offered the campaign advice, much of which was either followed or implemented independently. Additionally, Reed and Robertson repeatedly reminded the campaign about the Coalition's plans to distribute voter guide and make GOTV calls. And, President Bush attended a Coalition fundraising event, perhaps with the understanding that funds raised would go to cover voter guide costs. The FEC argues that Reed and Robertson either acted on behalf of the Coalition when interacting with the Bush campaign or their knowledge of the Bush campaign's strategy is imputed to the Coalition. In either case, the FEC asserts that the Coalition's expenditures of voter guides and GOTV calls were made with that knowledge to dovetail with the campaign's strategy.

As a preliminary matter, the Coalition argues that many of Robertson's and Reed's actions were done in their personal capacities and should not be attributed to the Coalition. The Coalition would have it

that unless Robertson or Reed expressly indicated he was acting in his Coalition capacity, his actions were taken as a private individual. This Court cannot accept that formulation; the First Amendment does not provide for general preemption of the state-law doctrine of apparent authority. Robertson and Reed frequently did not specify the capacity in which they acted.[56] It is true that corporate officers retain their individual First Amendment rights even when the First Amendment allows regulation of corporate speech, but the burden is on the speaker to establish whether his speech is individual or on behalf of the corporation.

Whether as private individuals or as corporate officers, Robertson and Reed clearly had special access to Bush–Quayle '92. Reed had extensive discussions concerning the campaign's thinking on a number of strategic issues. But the evidence also demonstrates that it was the Coalition that did most of the talking. Although the Coalition might qualify as a "special interest group" in today's parlance, it really is better described as a "faction" as that term was used in the eighteenth century. See, e.g., FEC Ex. 85 (Reed Montana Speech) at 33 ("Remember we're a minority. We're very ideologically motivated, very zealous, very excited."). Fervently focused on certain issues, the Coalition was one of many factions competing for the attention of Bush–Quayle '92's staff. The Coalition was in a position to advance its views both by shouting at the White House, ("we are getting more action on this issue from a liberal Democratic Governor than we have seen out of the Bush administration," FEC Ex. 035–0255), and by whispering in the campaign's ear, ("[a]s in the past, churchgoing evangelical Protestants and pro-family Catholics are the key to the resurrection of George Bush," FEC Ex. 023–000537 (Reed's strategy memo to campaign chairman Teeter)).

It is within this context that the Coalition advised the campaign of its plans for the volume of voter guides—40 million—planned for the 1992 election. The purpose of sharing this information clearly was to attract the attention of the campaign to the issues of greatest concern to the Coalition. The FEC makes much of the fact that this information was passed on to the campaign before it was made public. But campaign staff did not initiate a discussion or negotiation in response. More troubling is the evidence indicating that the campaign was advised that $500,000 was needed to meet the costs of voter guide production and that President Bush's fundraising appearance at the 1992 Road to Victory conference was intended by the Coalition and the campaign to raise that amount for that purpose. However, the evidence is too thin to support a holding that the sharing of information about the cost of producing 40 million voter guides was coordination. Even if the evidence incontrovertibly established that Bush's Road to Victory appearance was to fund the Coalition's voter guides, that by itself does not turn the corporation's subsequent expenditures into illegal campaign contributions.

Moreover, evidence of the other types of coordination are absent. The Bush–Quayle '92 campaign did not request or suggest that the Coalition make certain expressive expenditures. The campaign did seek Pat Robertson's endorsement, and did rent a mailing list from the Coalition to enhance the value of that endorsement, but the FEC has not alleged that either Robertson's endorsement or the rental terms were prohibited contributions as "things of value" given to the campaign.

The campaign was generally aware that on the Coalition's voter guides, President Bush would compare favorably—in the eyes of the target audience—with candidates Clinton and Perot. But Bush–

**56.** When asked why his campaign would seek the endorsement of Pat Robertson, President Bush testified: "He had this huge circulation in the media and he, I believe, was the head of the Christian Coalition, which gave me support at various times." FEC Ex. 7 at 33.

Quayle '92 staff did not enter into discussions or negotiations with the Coalition to produce that result. The Coalition may well have designed its 1992 presidential voter guides with non-public information gained by Reed from his proximity to the campaign, but, as the Court has explained, the First Amendment does not allow coordination to be inferred merely from a corporation's possession of insider knowledge from a federal candidate's campaign. Some more overt acts of coordination are required.

In other words, the campaign did not take action to suggest that it was a partner or joint venturer in the Coalition's voter guides. Campaign staff did not seek to discuss the issues that would be profiled or how they would be worded. Campaign staff did not respond when the Coalition advised that the guides would be distributed the Sunday before election day through select churches, and campaign staff did not seek to discuss increasing or decreasing the Coalition's 40 million target. The mere fact that the Coalition was singing from the same page as the Bush campaign on certain issues does not establish coordination. With regard to the Coalition's get-out-the-vote calls, the record is similarly devoid of evidence showing coordination.

Consequently, despite the close contacts between the Coalition and Bush–Quayle '92 throughout the 1992 presidential campaign, the evidence does not show that the Coalition coordinated its expenditures on voter guides or GOTV calls with the campaign.

**b. Helms for Senate**

By contrast to the evidence concerning Bush–Quayle '92, the FEC's evidence for coordination in the 1990 senatorial election in North Carolina is its weakest. In a nutshell, the FEC argues that Reed was privy to Senator Helm's private opinion polls showing that Helms was trailing and that the Coalition used this knowledge to target North Carolina as one of seven states in which to expend funds on voter guides and the only state in which to expend funds for GOTV calls. Not only is it factually questionable on this record whether Helms' poor standing in the polls prior to the election was "inside knowledge," but additionally there is no evidence or allegation that the Helms campaign requested or suggested that the Coalition distribute voter guides or make GOTV calls nor did the campaign discuss the content, timing, location or volume of the voter guides with the Coalition. The Coalition's expenditures on the 1990 senatorial election in North Carolina were not in-kind contributions to the Helms campaign.

**c. Inglis for Congress**

The FEC's evidence with respect to the 1992 election in the Fourth Congressional District of South Carolina also is built solely on its insider trading or conspiracy theory. Beverly Russell was a Coalition official and a volunteer for the Inglis campaign. Though Russell was privy to various campaign strategies, the FEC does not link that knowledge to any discussion or negotiation of the Coalition's expenditures on voter guides. The FEC asks the Court to infer that because Russell knew that the Inglis campaign sought to downplay Inglis' anti-abortion position, the Coalition's decision to include the abortion issue on its voter guide and to distribute the guides to the specific constituency for whom Inglis' anti-abortion stance would be most important, was done to facilitate the Inglis campaign's strategy.

The evidence does not support the inference. It may have been recognized by both the campaign and the Coalition that the targeted distribution of its voter guides would assist the Inglis campaign, but there is no evidence of discussion or negotiation to bring that result about. From this record, it seems the Coalition's voter guides tended to focus on the same range of issues across elections—abortion being almost universal—and in the Coalition relied extensively, if not exclusively, on churches to distribute its guides in many

elections. The FEC simply has not shown that the Inglis campaign became a partner in the Coalition's voter guide expenditures, and therefore those expenditures were not impermissible campaign contributions.

#### d. North for Senate

The evidence of coordination is quite close with respect to the 1994 Virginia senatorial election, with certain material facts being in dispute. Some senior Coalition personnel had close personal and professional ties to senior staff of the North campaign. Through these contacts, the Coalition became privy to much of the North campaign's strategic information.

But, as with the campaigns discussed above, the FEC has not shown that these discussions touched on the Coalition's plans to expend general corporate funds on voter guides and GOTV calls—with one possible exception. The deposition testimony of North's political director, Thomas Bunnell, raises a genuine issue of material fact as to whether North's campaign manager, Timothy Carpenter, discussed with Reed which issues should appear on the Coalition's voter guide. *See* FEC Ex. 6 (Bunnell Dep.) at 65. While Carpenter denies having had such discussions, the conflicting testimony is sufficient to raise a credibility issue that cannot be resolved on summary judgment. Aside from this possible coordination, the evidence on this record does not demonstrate any other form of coordination as to the Coalition's voter guides and GOTV calls.

 However, the facts also demonstrate that the Coalition provided the North campaign with another thing of value—the Farris list. Even if the names on the Farris list were publicly available, the fact that the Coalition expended resources to compile the list and cross-check it with the Coalition's house file, created value that was passed on to the North campaign. The record demonstrates that mailing lists have commercial value and are routinely rented for fundraising or other solicitation purposes. Contrary to Reed's opinion at the time, the fact that the Coalition gave the list to North's campaign consultant, Joe Elton, instead of a campaign volunteer did not take the transaction outside the scope of § 441b(a). *See* 2 U.S.C. § 441b(b)(2) ("a "contribution or expenditure'" shall include any gift of . . . anything of value . . . to any candidate. . . ."). The FEC's complaint encompasses this conduct and entitles it to relief. The Court will leave the amount of any civil penalty to be assessed in this regard for determination after resolving the factual dispute concerning the Reed–Carpenter discussions and after receiving evidence concerning the fair market value of the Farris list.

#### e. Hayworth for Congress

Again relying on its insider trading or conspiracy theory, the FEC alleges that the knowledge gained by Coalition official Thomas Grabinski through his volunteer activities for the Hayworth campaign should be imputed to the Coalition and that the Coalition's special efforts to target Hayworth's campaign to represent the Sixth Congressional District of Arizona resulted from access to that non-public knowledge. As should be obvious, those facts are insufficient to show coordination. While Grabinski was the person primarily responsible for deciding which churches would receive voter guides, he did not make his decisions based on any discussions or negotiations with the Hayworth campaign. The FEC argues that because Grabinski was both a Coalition and campaign insider, it must be inferred that Grabinksi coordinated the voter guide distribution with himself

The Court cannot so readily engage in this veil-piercing. Not only would it burden associational rights, but the evidence also shows that Grabinski's position in the campaign was such that his view of where the campaign might want the guides distributed would not necessarily be the candidate's view. A veil-piercing approach to coordination may be appropriate if an indi-

vidual had more complete decisionmaking authority for both a corporation and a campaign and the evidence indicated that corporate decisions to make expressive expenditures were taken to assist the campaign. But on these facts, coordination cannot be inferred merely from the fact that the Coalition's voter guide distributor wore two caps. Some discussion or negotiation is required.

### f. NRSC

■ Notwithstanding the fact that it was the NRSC that gave the Coalition $64,000, the FEC contends that the Coalition made an illegal contribution to the NRSC. As an initial matter, the Court agrees with the FEC that the contribution prohibition, as defined in § 441 b(b)(2), applies to corporate contributions to national party committees, such as the NRSC.

It is undisputed that the money NRSC gave the Coalition was spent on voter guides. The NRSC sponsored the Coalition's speech, but it did so explicitly acknowledging that it could not become a partner in that speech by discussing its contents or points of distribution. It is possible that the Coalition could be viewed as having donated a "service" to NRSC (converting its funds into voter guides) in violation of § 441b(a). But that would be a troublesome interpretation of the term "service."

■ A corporation's expressive expenditure becomes an illegal contribution when the candidate, or in this case the party committee, becomes a partner in the corporation's speech. Expressive coordinated expenditures are treated as contributions to avoid circumvention of the contribution limits. The dangers of circumvention are not apparent from these facts. As the Supreme Court has now clarified, the NRSC could independently spend unlimited amounts in support of its candidates. *Colorado Republican*, 518 U.S. at 626, 116 S.Ct. 2309 (plurality announcing the judgment).

Unless the facts were such as to demonstrate that the Coalition was providing the NRSC with an anonymity premium, these facts do not indicate that the Coalition's production and distribution of voter guides with the NRSC's money were an illegal contribution to the NRSC.

### CONCLUSION

For the reasons stated, it is hereby

**ORDERED** that the FEC's Motion for Summary Judgment is granted in part and denied in part consistent with this Opinion; it is

**FURTHER ORDERED** that Christian Coalition's Motion for Summary Judgment is granted in part and denied in part consistent with this Opinion; it is

**FURTHER ORDERED** that pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, judgment shall be entered forthwith on Count II in favor of the Coalition as there is no just reason for delay. It is

**FURTHER ORDERED** that as to Count I, partial judgment shall enter in favor of the Coalition. The FEC is entitled to partial judgment on Count I as to the Farris list and may also be entitled to judgment on its other claims in regard to the 1994 Virginia senatorial election. Resolution of the outstanding factual matters shall await the outcome of an appeal, if there be any.

**FURTHER ORDERED** that as to Count III the Coalition and the FEC are both entitled to partial judgment. Judgment for the Coalition shall enter in respect to the allegations concerning Reed's 1992 Montana speech and the Coalition's "Reclaim America" mailing. As to the FEC's allegations concerning the Coalition's Georgia mailing in support of the 1994 reelection campaign of Newt Gingrich, a declaratory judgment in the FEC's favor shall enter forthwith. Decision on the amount of civil penalty shall await the

outcome of an appeal, if there be any. It is

**FURTHER ORDERED** that the Court has finally resolved the majority of claims at issue in this case. Because many of those claims were bundled into single counts, the Court cannot enter final judgment on the entirety of Counts I and III. A separate judgment page is entered herewith for Count II and those aspects of Counts I and III that have been finally resolved so as to permit an appeal under Rule 54(b) as there is no just reason for delay. It is

**FURTHER ORDERED** that, in the alternative, if Rule 54(b) requires that all the claims within a single count be resolved before partial judgment can enter, this Court is of the opinion that this Order in relation to Counts I, II, and III involves controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b). It is

**FURTHER ORDERED** that the Court shall schedule a pretrial conference and trial at such time as any appeal has been finally resolved or upon the expiration of the time in which to file an appeal.[57]

IT IS SO ORDERED.

---

57. The Court appreciates the difficulty the parties will have in measuring that time— either 60 days or 10 days—depending upon the view the Court of Appeals takes of Rule 54(b).